UNITED STATES of America

v.

Harry H. MESSERLIAN and Henry F.
Wolkowski, Defendants.

Crim. No. 85–262 (AET).

United States District Court,
D. New Jersey.

April 29, 1986.

Gregory F. Linsin, Criminal Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., Bruce Merrill, Asst. U.S. Atty., Trenton, N.J., for the Government.

Anthony J. Fusco, Jr., Passaic, N.J., for defendant Messerlian.

Joseph A. Hayden, Jr., Hayden & Perle, Hoboken, N.J., for defendant Wolkowski.

## OPINION

THOMPSON, District Judge.

### INTRODUCTION

Harry Messerlian and Henry Wolkowski, members of the New Jersey State Police, move before this court for an order overturning the verdict of a jury which sat in judgment over a three-month trial. Messerlian stands convicted of violating the civil rights of Joseph Topolosky by striking him with a heavy, weapon-like flashlight—blows which resulted in Topolosky's death—as well as conspiring to obscure this beating from the eyes of federal authorities and lying to a federal grand jury. Wolkowski was convicted of conspiring with Messerlian "and others" to obstruct the federal investigation.

This jury was urged by the prosecution and defense counsel to adopt conflicting versions of the case. By the prosecution, they were urged to bring to justice men who allegedly abused the power and authority of their offices. By the defense, they were urged to vindicate men who, they argued, were properly performing the most dangerous and least rewarded job society asks of its members. The jurors heard testimony from civilians describing a brutal assault on a shackled, intoxicated prisoner. They heard police officers describe an orderly and proper arrest of a drunk driver who was placing his children—and others—at risk. They heard extensive and dense medical testimony in which distinguished and experienced doctors referred to the same evidence and reached contrary conclusions.

The jury heard considerable character evidence. Witnesses discussed the character of the victim, Joseph Topolosky. The character of the fact witnesses was made a significant issue on a number of occasions. The jurors were presented with an array of witnesses testifying to the good character of the defendants: family members, police officers, State Troopers, the Superintendent of the New Jersey State Police, agents of the F.B.I. (the federal law enforcement agency charged with investigating the death) and an incumbent County Prosecutor for the State of New Jersey. By turns these proceedings appeared to be a trial of Joseph Topolosky for having been a troubled, self-destructive and angry man; of the civilian eyewitnesses for their allegedly wrongful accusation that police officers had broken the law; of the New Jersey State Police for allegedly turning inward to protect its own; and of the United States Department of Justice for coming into this state to prosecute police officers who had not been brought to trial by the State of New Jersey.

After sitting through three months of trial the jurors took the case, deliberated for over 40 hours, and returned with their verdicts. They had the difficult task of assessing the credibility of the witnesses, deciding where the truth lay and drawing the legitimate inferences from the evidence. At the completion of their deliberations, they rendered unanimous verdicts.

We may not lightly disturb the considered and obviously conscientious determinations of the jurors. We must, of course, examine the record relied upon by the jurors to ensure that no defendant stands convicted on insufficient evidence or by an irrational verdict. With this tension in mind, we have examined the pending motions. In large part, they are supported by restatements of prior arguments. We addressed these arguments at length prior to trial and at the close of the government's case. We have reexamined the evidence and reconsidered the arguments for the purpose of ruling on the present motions. As is more fully described below, we find that these renewed motions must be denied.

A new issue arose following the return of the verdict, involving the emergence of the testimony of Dr. Marvin Aronson, Medical Examiner for the City of Philadelphia. The nub of Dr. Aronson's testimony is that the Office of the United States Attorney for the District of New Jersey concealed from the defendants evidence which could have aided them in their defense. He asserted, in a hearing before the court, that in 1984 he delivered to an attorney for the government an opinion that Joseph Topolosky's death was caused by a motor vehicle accident and not by a beating. We heard Dr. Aronson describe his version of his professional contacts with the U.S. Attorney's Office. We must find that Dr. Aronson came into court, sat in the witness stand, took an oath, and, for reasons unknown, lied. We find that no evidence of an exculpatory nature was concealed from the defendants.

We also find that Dr. Aronson's testimony is not "new evidence" giving rise to a basis for a new trial. His opinion testimony—for he offered no new facts—adds nothing of substance to that previously before the jury. His opinions are tied to the well-developed factual record of this case in only the most attenuated fashion; he did little more than connect selected portions of the evidence to an academic theory, while rejecting that factual evidence which he found inconsistent with his opinions.

## I. Testimony of Doctor Aronson

Following the return of the jury's verdict, but prior to the return date of the post-trial motions, we received a letter from Gregory Linsin, prosecuting attorney for the United States Department of Justice, regarding his contact with Richard Sprague, Esquire, of Philadelphia, an attorney for Dr. Marvin Aronson. By this letter, Mr. Linsin notified the court and defense counsel of Dr. Aronson's stated belief that the Office of the United States Attorney for the District of New Jersey had improperly concealed information from defense counsel in connection with this prosecution. Mr. Linsin indicated in his letter that Richard Sprague had communicated to him that "Dr. Aronson was of the view that the opinion he rendered orally to a member of the U.S. Attorney's Office was arguably exculpatory and Mr. Sprague inquired if Dr. Aronson's name had been provided to the defendants."

Mr. Linsin went on to state that Dr. Aronson, a forensic pathologist, had in fact been consulted by the U.S. Attorney's Office in 1984 in connection with its investigation into Joseph Topolosky's death; his name was not provided, however, because he "had never stated that he possessed any opinions that were exculpatory or arguably exculpatory in nature."

On February 26, 1986, counsel for defendant Messerlian conducted an oral deposition of Dr. Aronson. On the strength of the sworn statements taken at that time, defendants Messerlian and Wolkowski moved for a judgment of acquittal, or in the alternative for a new trial, or for a hearing to determine whether there had been a violation of the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). They argued that the statements of Dr. Aronson reveal the failure of the prosecution to turn over exculpatory information in violation of *Brady,* or that the opinions of Dr. Aronson constitute new evidence of a magnitude sufficient to warrant a new trial pursuant to FED.R.

CRIM.P. 33. The United States responded with the affidavits of Assistant United States Attorney Anne Singer and former Assistant United States Attorney Robert Fettweis. These affidavits appear to contradict Dr. Aronson's assertion that he offered an exculpatory opinion to Ms. Singer. The United States argued that Dr. Aronson's statement in this regard was incredible, or in the alternative that any information provided was not material to the issues involved in the trial. It therefore argued that defendants' motion should be denied.

On March 6, 1986, we determined that the deposition testimony of Dr. Aronson and the affidavits of Ms. Singer and Mr. Fettweis raised genuine issues of material fact on the *Brady* issue, and we scheduled a hearing. *See United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir.1977), *cert. denied*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); *Government of the Virgin Islands v. Martinez*, 780 F.2d 302, 306–08 (3d Cir.1985). On March 14, 1986, Dr. Aronson and Ms. Singer testified at some length.[1]

### A. Brady Violation

In *Brady*, the United States Supreme Court analyzed the duty of a prosecutor to disclose exculpatory information to a defendant. The Court determined that the Due Process Clause of the Fourteenth Amendment guarantees that a guilty conviction be based on a defendant's guilt, and not on gamesmanship or deception practiced by the prosecution. The Court noted that it had long been recognized that a prosecutor who "depriv[es] a defendant of liberty through a deliberate deception of the court and jury by the presentation of testimony known to be perjured," 373 U.S. at 86, 83 S.Ct. at 1196, *quoting Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), or who "allows [perjury] to go uncorrected when it appears," 373 U.S. at 87, 83 S.Ct. at 1196, *quoting Napue v. Illinois*, 360 U.S. 264,

269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), violates the defendant's rights to due process. The Court extended this rule in *Brady* to

> hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. at 1196. The prosecutor's duty to disclose was subsequently extended to situations in which either a general *Brady* request is made or no request is made. "[E]lementary fairness requires" that material exculpatory information in the possession of the prosecution be disclosed regardless of a failure of the defendant specifically to request it. *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).

Defendants argue that the evidence allegedly withheld is *Brady* material because it tends to demonstrate that Joseph Topolosky's death was caused not by blows, but by accidental means; they also argue, however, that the alleged failure to disclose goes beyond *Brady* in that it improperly limited the defendants' ability to confront adverse witnesses—specifically, the medical experts proffered by the United States. (Defendants' Joint Brief, dated March 3, 1986, p. 4.) This apparent bifurcation of defendants' argument is unnecessary, however. The analysis of an allegation by a defendant that he has been denied the right to confront a hostile witness, *see Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), where the basis of the alleged denial is the prosecutor's non-disclosure of impeachment evidence, has been subsumed into the *Brady* analysis. In *United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court stated that:

> Impeachment evidence ... as well as exculpatory evidence[ ] falls within the

---

1. Mr. Fettweis was made available, but we determined that his testimony would not significantly aid us in our determination of the matter. The United States agreed to rest on his affidavit; counsel for defendants did not call him as a witness or object to the court's decision that he not testify. (T228–230, hearing of March 14, 1986).

*Brady* rule. *See Giglio v. United States*, 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972). Such evidence is "evidence favorable to an accused," *Brady*, 373 U.S., at 87 [83 S.Ct., at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.

\* \* \* \* \* \*

The Court of Appeals treated impeachment evidence as constitutionally different from exculpatory evidence. According to that court, failure to disclose impeachment evidence is "even more egregious" than failure to disclose exculpatory evidence "because it threatens the defendant's right to confront adverse witnesses." [*Bagley v. Lumpkin* ] 719 F.2d [1462], at 1464.

\* \* \* \* \* \*

This Court has rejected any such distinction between impeachment evidence and exculpatory evidence.

105 S.Ct. at 3380.

*Bagley* instructs us that the allegation of a failure to disclose information helpful to the defendant, whether that information is exculpatory evidence or impeachment evidence, must be examined by reference to the same *Brady* standards.[2]

■ We address the record, then, to determine whether the United States failed to disclose material which, "in the context of the entire record ... creates a reasonable doubt that did not otherwise exist" as to the guilt of Messerlian and Wolkowski. *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402. The inquiry follows two steps: Initially, we must determine that there was a failure to disclose information known to the United States; if so, we must determine whether

that withheld information was *material* to the issues before the court. The Third Circuit has described the Supreme Court criteria for a finding of materiality as follows:

> "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [*United States v. Bagley*, — U.S.] at —, 105 S.Ct. at 3385 (opinion of Blackmun, J.), *see also id.* (opinion of White, J., concurring in part and concurring in judgment). Justice Blackmun's opinion further defined "a 'reasonable probability' as 'a probability sufficient to undermine the outcome.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)).

Although the Court in *Agurs* had distinguished the situations in which defendants had made no request for disclosure, had made a general request, or had made a specific request, the Court held in *Bagley* that the announced standard for materiality was "sufficiently flexible" to cover each of these situations. *Bagley*, — U.S. at —, 105 S.Ct. at 3385.

*United States v. Pflaumer*, 774 F.2d 1224, 1226 (3d Cir.1985). *See also, Government of the Virgin Islands v. Martinez, supra,* 780 F.2d at 306 (discussing *Bagley*); *United States v. Starusko*, 729 F.2d 256, 260 (3d Cir.1984) (discussing impeachment evidence).

Much has been written about this "materiality" requirement; the battleground on which most *Brady* challenges are fought is that of the definition of materiality and the application of that definition to the facts of a case.[3] In this case, both criteria of the

---

**2.** For an informative discussion of the development of the *Brady* rule, and of the considerations relevant to the *Brady* analysis in various factual situations, *see United States v. Oxman,* 740 F.2d 1298, 1306–19 (3d Cir.1984) *vacated sub nom United States v. Pflaumer,* — U.S. —, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985) *on remand United States v. Pflaumer,* 774 F.2d 1224 (3d Cir.1985).

**3.** In most reported cases, the non-disclosed evidence is recorded either in documents or otherwise, and the prosecutor's possession of it is not in dispute. For that reason, most reported cases dealing with the *Brady* issue do not discuss whether in fact there has been a failure to disclose, but rather move directly to the issue of materiality. *See e.g., United States v. Adams,* 759 F.2d 1099 (3d Cir.1985); *United States v. Oxman,* 740 F.2d 1298 (3d Cir.1984) *vacated and*

*Brady* claim—non-disclosure and materiality—are disputed. Before we may address the materiality issue, then, we must consider whether, in fact, the United States improperly withheld information to which it had access. The *Brady* obligation arises from the prosecutors' dual role as advocate and "servant of the law." *Agurs,* 427 U.S. at 110–11, 96 S.Ct. at 2400–01. As the *Agurs* Court stated,

the fact that [exculpatory] evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from some neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that the newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

427 U.S. at 111, 96 S.Ct. at 2401.

■ In his sworn statement, Dr. Aronson stated that Ms. Singer called him on or about March 6, 1984, to ask him to "review ... material [regarding the death of Joseph Topolosky] and form an opinion." (p. 6, deposition of Dr. Aronson of February 26, 1986). After he had reviewed the material,[4] he again, within one or two weeks, contacted her to discuss the case. At deposition, he stated that he informed Ms. Singer at the time of their second telephone conversation that he believed that the death "could be accounted for" by a fracture of the second cervical vertebra, producing a hemorrhage at the base of the

brain. (*Id.,* p. 8). He also remembered stating that he could rule out neither the possibility that the death was caused by a blow from a flashlight nor the possibility that the blow was caused by traffic accident preceding the arrest. (*Id.*) The transcript contains the following questions and answers at page 8:

Q. What was your final conclusion with regard to the allegation of the beating of the victim?

A. My final conclusion was that I did not believe that the victim in this case was beaten to death.

Q. Did you tell her [Singer] that on the phone?

A. Yes.

Dr. Aronson's statement of February 26 also contains references to the effects of the particular hemorrhage he described; he stated that he told Ms. Singer that the hemorrhage could cause abnormal conduct, and that the abnormal conduct observed on the night of the victim's death "could be related to an injury sustained in the automobile accident." (*Id.* p. 9). Although the testimony contained in this statement is somewhat tentative in places, it is clear that Dr. Aronson intended by his deposition testimony to convey his feeling that he had communicated a tentative opinion to Ms. Singer which was exculpatory in nature, and that he was not again contacted by any person connected with the prosecution, except for the payment of his bill, until he initiated such contact after the jury had returned a verdict.

Ms. Singer's affidavit of February 26, 1986, is in sharp conflict with this testimony. Paragraphs 7 and 8 of that affidavit which discuss Ms. Singer's recollections of

---

remanded sub nom *United States v. Pflaumer,* — U.S. ——, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985) *on remand* 774 F.2d 1224 (3d Cir.1985); *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817 (9th Cir.1985) *cert. denied,* — U.S. ——, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985); *Haber v. Wainright,* 756 F.2d 1520 (11th Cir.1985); *Fitzpatrick v. Procunier,* 750 F.2d 473 (5th Cir.1985); *Hickey v. Solem,* 728 F.2d 1149 (8th Cir.1984); *but see, United States v. Provenzano,* 521 F.Supp. 403 (D.N.J.1981), *aff'd* 681 F.2d 810 (3d Cir.

1982), *cert. denied,* 459 U.S. 861, 103 S.Ct. 136, 74 L.Ed.2d 116.

4. The letter sent by Ms. Singer to Dr. Aronson following this initial conversation was admitted into evidence at the March 14 hearing, and was marked DMW-2. That letter contains a list of the materials which Dr. Aronson agrees he received and reviewed.

her second (and last) conversation with Dr. Aronson, read as follows:

7. Dr. Aronson stated that, in his opinion, the medical evidence indicated that Topolosky had been struck by another person; he stated that he believed the force utilized was moderate and not severe; and he further outlined his opinions concerning the cause and manner of death which were similar to those previously rendered by Drs. Rudolph Platt, Robert Goode and Charles Hirsch.

8. Dr. Aronson never stated to me that there was no evidence to support the conclusion that Topolosky had been struck by another person; he never stated to me that he disagreed with the conclusions of Drs. Platt, Goode and Hirsch that the manner of Topolosky's death was a homicide; and he also never stated to me that he believed that Topolosky's fatal injuries were sustained in the motor vehicle accident.

The affidavit of Robert Fettweis reveals no personal knowledge of the substance of the telephone conversations between Dr. Aronson and Ms. Singer.

We were faced, prior to the hearing, with a sharp conflict between Dr. Aronson and Ms. Singer on the threshold question of whether in fact the United States had been, prior to trial, in possession of arguably exculpatory opinion testimony from Dr. Aronson. The testimony adduced at the hearing of March 14 only served to deepen the conflict, making it absolutely clear that either Dr. Aronson or Ms. Singer, but not both, were testifying truthfully.[5]

At the hearing, Dr. Aronson testified that he told Ms. Singer that the cause of death, in his opinion, was a "Dimitri lesion," [6] an injury to the vertebral artery at its passage through the first cervical vertebra (the "atlas"), which results in remote bleeding at the base of the brain. He further testified that the identification of the fatal injury as a Dimitri lesion could help explain the "abnormal activity" of the victim—a reference to the so-called "manic" behavior of Topolosky while he was in the rear seat of the troop car. (Transcript of March 14 hearing, p. 27, [hereinafter "HT"]). He stated that he communicated as his "primary opinion" the belief that the hemorrhage resulted from motor vehicle accident, and not from the beating. His (apparently secondary) opinion was that if the injury was not caused by the accident, "there was not a great deal of force used and it didn't constitute a beating under those circumstances." (HT28). On direct examination, the following exchange took place:

Q. Doctor, let me ask you what your opinion was and is with regard to the manner of death of Mr. Topolosky?

A. In my opinion the manner of death is accident.

Q. Did you convey that to Anne Singer either in specific terms or by the nature of your conversation with her?

A. I may not have used the specific term but I know I indicated to her my opinion was the injuries sustained were much more likely to have occurred as a result of the automobile accident than as a result of an injury by anyone else.

---

**5.** In many cases, counsel's proffer of testimony before a witness has been subjected to the adversary process is such that sharper factual disputes are anticipated than are produced. This is not such a case. We cannot, as factfinder, dismiss the disparity between Dr. Aronson's and Ms. Singer's recollection of events as the products of mistake or faded memory. They were both subjected to skillful and vigorous cross-examination, and both firmly maintained that they were certain that their versions of the content of their telephone conversations were the correct versions. Our observation of their demeanors while testifying, when coupled with

their diametrically opposed testimony, compels us to conclude that one is lying.

**6.** The designation of the hypothesized injury as a "Dimitri lesion" is apparently jargon peculiar to the Philadelphia Medical Examiner's Office. (Transcript of March 14 hearing, p. 27). The name is taken from the author of an article published in Vol. 16, No. 1 of the *Journal of Forensic Sciences*, p. 40 ff. (January 1971). This article was entered into evidence at the hearing, and bears the number DWM-7. The details of this category of injury are discussed further in Part I(B) of this opinion, *infra*.

This would make [sic] it in the classification of an accident. (HT44). On cross-examination, Dr. Aronson reaffirmed that he had communicated to Ms. Singer his opinion that the motor vehicle accident caused the death (HT67), that if death was in fact caused by a blow, it was a blow of only moderate force (HT70), and that the nature of the hypothesized injury could explain the cause of Topolosky's observed abnormal behavior. (*Id.*).

On cross-examination he was questioned about a page of hand written notes which he had identified as a transposition of notes recorded contemporaneously with his review of the records and his second telephone conversation with Ms. Singer, and which had been entered into evidence bearing the number DWM-5.[7] Dr. Aronson agreed that he had recorded nothing in these notes to reflect his transmittal to Ms. Singer of an opinion that the cause of death was accidental and that the manner of death was motor vehicle accident. (HT70).

Ms. Singer's testimony portrayed a different conversation. She recalls Dr. Aronson communicating "his conclusion that the death of Mr. Topolosky was caused by blows and that the degree of force was moderate." (HT120). She testified that she understood at that time that the medical evidence previously gathered identified the cause of death as a subarachnoid hematoma caused by blows from another person. (HT113). She recalls the "bottom line" of Dr. Aronson's oral opinion as being consistent with the existing medical evidence. (HT121). She testified that Dr. Aronson never told her that he believed that the death was caused by the motor vehicle accident. (HT121). She testified that he never discussed a Dimitri lesion with her,

or the possibility that the subarachnoid hemorrhage was caused by a fracture of a cervical vertebra. (HT122–23). She testified that he never told her that there was no evidence of a beating in this case, and said that she was certain of this fact because it would have been completely unexpected, and therefore very significant to the investigation. (HT124). On cross-examination she agreed that it is "possible" that Dr. Aronson discussed the motor vehicle accident and Mr. Topolosky's "thrashing about" in the back seat, but only in relation to certain "superficial injuries." (HT165–66). She also agreed that she retains—indeed that she had recorded—no notes of her conversations with Dr. Aronson. (HT161–63, 172). She testified that it was her usual practice to instruct medical experts not to prepare a written report unless and until she determined that such a report was necessary (HT 125–26). She testified that she did not consider a report necessary because she considered Dr. Aronson's report duplicative of the reports he had previously reviewed. (HT121, 124, 172). She testified that she understood her *Brady* obligations, and that she would have treated an exculpatory opinion received from Dr. Aronson as such. (HT125 (direct examination); HT172, 223–25 (cross-examination)).

We have had the opportunity to review Dr. Aronson's sworn statement and the affidavits of Ms. Singer and Mr. Fettweis; we have observed both Dr. Aronson and Ms. Singer testify at length on March 14, 1986; we have benefited from the oral argument presented in this matter on March 25, 1986. We now enter findings of fact and conclusions of law.

### FINDINGS OF FACT

1. In March of 1984 Assistant United States Attorney Anne Singer was engaged

---

7. DWM-5 is a single sheet of lined yellow paper with hand written notes. Dr. Aronson testified that these notes were produced approximately one year ago when he discarded many of his files. He testified that he transcribed a "previously made note" made near the time of the second conversation. (HT31–32). The portion of DWM-5 which concerns the conversation with Ms. Singer reads as follows:

12:10–12:20 PM on 16 March 84
Conversation cf Singer
Dx–"Dimitri" Lesion, may take time to develop. cw single blow c flat or sideways hand +/or flashlight to left side of neck to "get attention" and probably no justification for fed. prosecution.

in the investigation into the circumstances of the death of Joseph Topolosky.

2. Ms. Singer had reviewed the reports and findings of several doctors in connection with this investigation, including those of Doctors Epstein, Platt, Lindenberg, Hirsch and Goode.

3. Ms. Singer, in March of 1984, contacted Dr. Aronson for the purpose of engaging him to review the record of the investigation. She sought his opinion both as to the cause of death and the degree of force applied in causing the injuries. She provided certain documents to Dr. Aronson to provide him with a basis for his opinions.[8]

4. Dr. Aronson reviewed these materials, and contacted Ms. Singer approximately ten days after their initial telephone conversation to deliver to her a preliminary oral opinion.

5. The substance of the oral opinion which Dr. Aronson communicated to Ms. Singer was that the cause of death was a subarachnoid hemorrhage caused by blows of moderate force.

6. I find that Dr. Aronson did *not* tell Ms. Singer that he believed the cause of death to have been a Dimitri lesion, and that he did not discuss a fracture of the first (or second) cervical vertebra with her.

7. I find that Dr. Aronson did not discuss with Ms. Singer his theory that a leakage of blood caused by a Dimitri lesion could explain the "manic" behavior of Joseph Topolosky.

8. I find that Dr. Aronson did not tell Ms. Singer that he held the opinion that Joseph Topolosky's death was caused by the motor vehicle accident.

8. I find that the materials received and reviewed by Dr. Aronson were those listed on Exhibit DWM-2, the cover letter sent by Ms. Singer with the materials, dated March 6, 1986. The materials are listed in the cover letter, and consist of reports of Doctors Platt, Epstein, Hirsch, Lindenberg and Goode (items a through d and f); an FBI interview of Dr. Goode (item e); transcripts of the testimony of Trooper McClelland and Doctors Goode and Platt before the Union County, New Jersey grand jury (items g through j); an accident report of Trooper Messerlian (item k); deposition testimony of Trooper Mes-

## DISCUSSION

Both Dr. Aronson and Ms. Singer have extensive professional backgrounds and impressive credentials in their fields. We are firmly convinced by a review of the record, having had the opportunity to observe the courtroom appearance, manner and conduct of the witnesses, that Ms. Singer testified truthfully and Dr. Aronson did not. Although we base our determination to a significant degree on an assessment of intangible factors—tone of voice, manner of reacting to questions, responses to questions and attitudes displayed—we do not rely solely on that raw credibility assessment.

We have examined the progress of Dr. Aronson's description of his second conversation with Ms. Singer, from the notes which purport to reflect his contemporaneous impressions, to his letter to his attorney dated January 31, 1986, and entered into evidence as DWM-9, to his sworn testimony on February 26, 1986, to his testimony before this court on March 14, 1986. We conclude that the enhancement of his recollection of transmitting exculpatory information at each stage calls into question the reliability of that recollection.

In his notes marked DWM-5, he mentioned a Dimitri lesion, and found the injury to be consistent with a "single blow" with a hand or a flashlight to "get attention." There is no mention of even the possibility that injuries sustained in the motor vehicle accident caused the death.

On January 31, 1986, he recalled that he told Ms. Singer that there was no "beating,"[9] that the "fatal blow was a single

serlian (item l); and a letter from the Union County Prosecutor to the Union County Assignment Judge requesting the dismissal of the indictment returned by the Union County grand jury (item m). The autopsy report (item a) was apparently not sent with the original package, but was sent a few days later.

9. Dr. Aronson apparently holds a rather idiosyncratic view of what constitutes a "beating." We questioned him when he was before us, and the following exchange took place:

blow to the left side of the neck," and that there was a "possibility" that the injury to the left side of the neck was sustained in the motor vehicle accident.

On February 26, Dr. Aronson testified that the death "could be" accounted for by a fracture of the second[10] cervical vertebra causing a hemorrhage at the base of the brain. He stated that he told Ms. Singer that such an injury would produce abnormal behavior. He also stated that he told her that he "could not rule out the possibility that the injury was sustained by being struck by a flashlight, I could also not rule out the injury being sustained in the automobile accident which preceded the arrest of the deceased in this case," and that his "final conclusion was that I did not believe that the victim in this case was beaten to death." (Deposition transcript of February 26, 1986, p. 8).

Prior to his testimony in this court, then, Dr. Aronson had stated that his recollection of his oral opinion delivered to Ms. Singer was that it was possible that the death was caused by a Dimitri lesion, that the injury could have been sustained either in the automobile accident or at the hands of Trooper Messerlian, and that he did not believe that Topolosky had been struck by Messerlian more than four times.[11]

As we have described in more detail *supra*, Dr. Aronson's testimony at the hearing was to the effect that he had delivered to Ms. Singer a firm opinion that the cause of death was accidental. (HT44, 67). We are disturbed by this progression in Dr. Aronson's testimony. His recollection apparently moved in a steady fashion from a point where he had suggested possible alternative manners of death to the final point, at the hearing before this court, where he stated his final conclusion that the death should be classified as accidental, as having been caused by the motor vehicle accident.

We are also concerned that Dr. Aronson's various formulations of his *present* opinion as to the manner and mechanism of death have undergone a similar progres-

THE COURT: Why do you say you do not believe Mr. Topolosky was beaten?
THE WITNESS: Because of the fact the injury which produced his death was primarily the injury behind his left ear which constitutes one blow. If in fact it was a blow or one impact, if it was an impact, and that [sic] the beating implies numerous types of blows, numerous injuries.
THE COURT: How many?
THE WITNESS: More than five or six.
THE COURT: That would be your definition of a beating?
THE WITNESS: I would begin to suspect a beating at that level and if more injuries were observed I might get to be more convinced the beating had taken place.
THE COURT: If there was an [sic] evidence of three to four blows that would not be considered a beating by you?
THE WITNESS: Not necessarily in a case where there had been an accident preceding where there might have been injuries sustained in that accident.
THE COURT: I'm not talking about an accident now. I'm just trying to understand your definition of what is a beating.
THE WITNESS: I would begin to use the term beating if I saw five or more blows in a given individual that were definitely the result of another person's action.

(Transcript of March 14, 1986 hearing, HT105–106). We find that the threshold set by Dr. Aronson at which a series of blows becomes a beating is not helpful in a case involving the alleged violation of 18 U.S.C. § 242. We find nothing in the case law which would allow this definition of a "beating" to be in any way relevant to a discussion of the guilt or innocence of Messerlian of the charge contained in Count I of the indictment that he did "wilfully assault, strike and beat Joseph P. Topolosky ... resulting in the death of Joseph P. Topolosky." Indeed, the testimony in this case was to the effect that the death resulted from a "beating" of three or four blows.

10. In the transcript of the February 26, 1986 deposition, Dr. Aronson is quoted as referring to the Dimitri lesion as an injury to the *second* cervical vertebra; at the hearing on March 14, 1986, he referred to it as an injury to the *first* cervical vertebra. He explained this discrepancy by asserting that he had either misspoken on the previous occasion, or had been misquoted. At any rate, it is clear that what Dr. Aronson referred to at the March 14 hearing as a Dimitri lesion is in fact an injury to the first cervical vertebra (the "atlas"). (DWM-7, pp. 40–41).

11. *See* footnote 9, *supra*.

sion.[12] In evaluating his credibility, we were influenced by this similar unexplained modification of his 1986 view of the manner and mechanism of death from a "possibility" on January 31 that death resulted from injuries sustained in the motor vehicle accident (see DWM-9) to a reasonable degree of medical certainty on March 14, 1986 (HT85), notwithstanding his inability to articulate a basis for this change in position, (HT91).

Ms. Singer, on the other hand, appeared to testify truthfully. Her responses to questions were consistent, intelligent, and unambiguous. We have considered her failure to maintain any record of her conversations with Dr. Aronson, but we regard this as evidence of flawed recordkeeping (and perhaps professional judgment) rather than evidence of present lack of credibility. She testified on cross-examination, after persistent questioning, that she may have timed the preparation of expert's reports in civil cases in order to gain tactical advantage. (HT223–24). Defense counsel argued that she did so in this case, either in ignorance of her obligations under *Brady*, or in intentional disregard thereof.

They argued that Ms. Singer "buried" the opinion of Dr. Aronson with the aim of preventing defendants from obtaining favorable expert testimony. They argued that this theory is not inconsistent with the fact that this prosecution was ultimately undertaken pursuant to a decision by the Civil Rights Division of the U.S. Department of Justice, and not the United States Attorney's Office for the District of New Jersey. They argue that the common bonds of prosecutorial agencies would lead Ms. Singer to conceal the opinion of Dr. Aronson regardless of the identity of the prosecuting agency.

We considered the logic of this theory. We find, however, that it is improbable that it accurately describes Ms. Singer's conduct in this case.[13] Our observations of Ms. Singer's demeanor on the witness stand and the unlikely nature of the defendants' theory of her misconduct have convinced us to credit Ms. Singer's testimony.

## CONCLUSION OF LAW

We have found that the opinion transmitted to Ms. Singer by Dr. Aronson was that Joseph Topolosky's death was caused by blows from another person administered with moderate force. We have been presented with no argument by which such an opinion could be construed as exculpatory, or as providing ammunition for the impeachment of medical experts.[14] The *Brady* doctrine does not require the United States to "make a complete and detailed accounting to the defense of all police investigatory work on a case," *Agurs*, 427 U.S. at 109, 96 S.Ct. at 2400, *quoting Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).

12. We will discuss the development of Dr. Aronson's opinion as to the manner and mechanism of death in Part I(B) *infra*.

13. We came to this factual conflict with a presumption that both the Medical Examiner for the City of Philadelphia and an Assistant U.S. Attorney will testify truthfully. Demeanor evidence aside, we found Dr. Aronson's testimony incredible on the basis of the variable nature of his recollection, and on the internal illogic of his explanations. Ms. Singer's testimony was quite consistent. Cross-examination produced no demonstration of uncertainty or indication of prevarication.

In this case we also find it unlikely that even an unethical attorney would "bury" an exculpatory opinion from Dr. Aronson. The effect of such an improper course of conduct would be to jeopardize the prosecution, as it is well within the realm of possibility that New Jersey defense counsel would approach the Medical Examiner for the City of Philadelphia for a medical opinion during the course of the trial.

14. Counsel for defendant Messerlian appeared to suggest at the hearing on March 14 that it could have been a *Brady* violation for the United States to have failed to turn over the opinion of Dr. Aronson that the degree of force of the blow to the back of the neck (if there was such a blow) was moderate. (HT199–200). This argument was not pressed. As Ms. Singer pointed out at the hearing, counsel for Messerlian was aware of expert testimony to this effect prior to the time of trial. At trial, counsel for Messerlian repeatedly stressed that it was his belief that the State prosecution was dismissed primarily due to the medical evidence that the degree of force was moderate.

We find that the United States did not possess the exculpatory evidence which was the subject of this motion prior to trial, and we therefore, without reaching the question of materiality,[15] find that there was no *Brady* violation.

## B. New Trial

Defendants assert that the evidence now proffered by Dr. Aronson entitles them to a new trial pursuant to FED.R.CRIM.P. 33. Our determination that the United States did not have possession of the evidence now offered by Dr. Aronson prior to trial is no impediment to the Rule 33 motion. Defendants argue that this evidence was not made available to the jury through no fault of the defendants, and that its consideration by the jury would lead to a judgment of acquittal.

■ Rule 33 allows this court to grant defendants a new trial "in the interest of justice." The guidelines adopted by the Third Circuit for assessing a motion for a new trial constitute a five-part test. To prevail on this motion, the defendants must establish the following:

1. The evidence was discovered since the trial;

2. The late emergence of the evidence is not due to a lack of diligence on the part of defendants;

3. The evidence is not merely cumulative or impeaching;

4. The evidence is material to the issues involved at trial; and

5. The evidence is of such a nature that it would probably produce an acquittal upon retrial.[16]

■ The nature of the last three elements of this test is such that we must consider not merely the evidence and testimony adduced in connection with this motion, but also the relationship between this evidence and the evidence adduced during the trial. *See United States v. Herman*, 614 F.2d 369, 372 (3d Cir.1980); *United States v. Johnson*, 713 F.2d 654, 661–62 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); 3 Wright, *Federal Practice and Procedure*, ¶ 557, p. 337 (1982).

■ The new evidence offered by defendants in this case is the expert testimony of Dr. Aronson. There is no question but that Dr. Aronson would be accepted in this court as an expert in the field of forensic pathology, and in fact he was accepted as such for purposes of the hearing on March 14, 1986. We must determine, in light of the extensive expert testimony previously presented to the jury, and in light of the nature of the "new" evidence offered, whether defendants have satisfied the five elements of the *Berry* rule as adopted in this Circuit.

As discussed *supra*, Dr. Aronson was supplied by Ms. Singer with certain materials related to the investigation of Joseph Topolosky's death. Dr. Aronson examined approximately 366 pages of documents and 57 photographs over a period of five hours in order to reach his tentative opinion. (HT60). Dr. Aronson was questioned at the hearing with regard to whether he had studied the case further prior to the hearing in this court, and he identified no such further study. (HT90–91). At the hearing,

**15.** Were we to reach this issue, we would hold that the information purportedly transmitted to Ms. Singer, had it been transmitted in turn to defendants, would probably not have resulted in a different outcome in this case. *See Pflaumer, supra*, 774 F.2d at 1226. The basis for this holding would largely track the discussion in Part I(B) *infra*, of the cumulative and unconvincing nature of Dr. Aronson's testimony.

**16.** This test has been referred to as the *"Berry* rule," a reference to *Berry v. State*, 10 Ga. 511 (1851), the case to which these guidelines are traced. *See United States v. Johnson*, 327 U.S. 106, 110 n. 4, 66 S.Ct. 464, 466 n. 4, 90 L.Ed. 562 (1946). The Third Circuit borrowed its formulation of this rule from *Johnson v. United States*, 32 F.2d 127, 130 (8th Cir.1929), *see United States v. Rutkin*, 208 F.2d 647, 649 (3d Cir.1953); *United States v. Howell*, 240 F.2d 149, 159 (3d Cir. 1956); *United States v. Bertone*, 249 F.2d 156, 160 (3d Cir.1957). Failure to establish any of these elements is fatal to a Rule 33 motion. *See United States v. Adams*, 759 F.2d 1099 (3d Cir. 1985); *United States v. Iannelli*, 528 F.2d 1290 (3d Cir.1976).

he presented testimony as to the cause, manner and mechanism of Joseph Topolosky's death.[17]

When asked to identify the cause of death, he testified as follows:

A. Death is due to a fracture of the lateral, the left lateral process of the atlas associated with a laceration of the vertebral artery producing intercranial bleeding [a "Dimitri" lesion].

Q. So that the cause of death would be a subarachnoid hematoma, is that correct?

A. The ultimate cause of death is the subarachnoid hemorrhage and I prefer the term hemorrhage although they are almost identical in meaning.

(HT63). In discussing the manner of death, Dr. Aronson testified that he had told Ms. Singer that "the injuries were sustained in the automobile accident." (HT30). When asked his present opinion as to the manner of death, he testified: "In my opinion the manner of death is accident." (HT44). He testified that he holds that opinion to a reasonable degree of medical certainty. (HT85).

Much of Dr. Aronson's testimony was concerned with his description of the nature of a Dimitri lesion. He described this lesion as the result of an impact to the first cervical vertebra (the "atlas") which results in its fracture. This fracture results in damage to the vertebral artery, which is a major conduit of blood to the brain and which passes through the transverse processes of the upper six vertebrae on its path to the brain. The damage to this artery is such, Dr. Aronson testified, that

bleeding would not be detected at the site of the impact, but rather at a remote portion of the arterial system, where the walls of the blood vessels are much weaker.

He described the mechanics of the lesion as a rupture of the innermost of three layers of the vertebral artery at the site of the impact, within the atlas. Blood then enters the interstices between the innermost layer of the artery and the middle layer. Blood then travels up this interstitial channel, accelerated by the pressure created by the impact, until it reaches that area of the brain where "the vertebral artery joins a circle of arteries called the circle of [W]illis." The walls of arteries, he testified, are much thinner within the skull than without; the combination of the increased pressure of the impact and the presence of this blood between layers of the arteries causes an artery to burst within the subarachnoid space.[18]

On cross-examination, Dr. Aronson discussed the location of remote bleeding which is associated with a Dimitri lesion as he describes it. He stated that "a rupture takes place inside the brain—inside the skull in the circle of Willis." (HT74–75). He was asked to identify more precisely where such a rupture would take place. In so doing he identified an artery within the circle of Willis as the usual site for the rupture: the posterior communicating artery, which connects the posterior cerebral artery with the middle cerebral artery. All three of these arteries are within the network of arteries known as the circle of Willis.[19]

17. The pathologists testifying in this case uniformly used the term "cause of death" to identify that disease or medical incident which resulted in death, *e.g.,* heart attack. They used the term "manner of death" to identify the category of means of death into which a particular case fits. There are five such categories: homicide, accident, suicide, natural and undetermined. (*See* trial testimony [hereinafter "TT"] of Dr. Rudolf Platt, vol. 22, pp. 4100–01). In discussing the particular means by which an individual injury came about, the doctors used the term "mechanism" of injury.

18. Dr. Aronson describes this mechanism throughout his testimony. It was described in detail at HT33–34 and 74–75. He referred to the article of his former colleague Dimitri Contostavlos, identified in footnote 6, *supra,* as a scholarly source for this theory. The mechanisms of this lesion are discussed at pp. 43–45 of this article.

19. The discussion is contained at HT74–76. During the course of this discussion, Dr. Aronson placed markings on a diagram of the blood vessels of the base of the brain, (G–15), graphically locating the site of the rupture.

Dr. Aronson agreed that this system of blood vessels had been examined by Dr. Hirsch, and that no rupture had been found, although an artifactual tear had been identified.[20] He also agreed that two autopsies had been performed, and that neither pathologist had identified a fracture of the atlas.[21] He nevertheless maintained his opinion that death had been caused by fracture of the atlas, which, in his opinion resulted in a fatal subarachnoid hemorrhage.

Dr. Aronson testified that he believed that the Dimitri lesion was caused by an impact suffered during the motor vehicle accident. He testified that the lesion is consistent with a blow of moderate force from a flashlight, but he expressed the opinion that it was suffered as a result of the motor vehicle accident, at which time, he theorized, Joseph Topolosky could have been propelled within the van in such a fashion that his atlas struck an unknown, hard object within the van, causing the fracture. He appears to suggest that he selected the motor vehicle accident as the mechanism for the injury rather than a blow because he believed that an injury suffered prior to the arrest would better explain Topolosky's "mania" in the back seat of the troop car. (HT27–28; HT30–31). He agreed that an impact which would cause a fracture to the atlas would cause a visible sign on the surface of the skin; when asked to comment on the fact

that neither Dr. Epstein nor Dr. Platt identified an external injury to the skin in the area over the atlas, he replied: "The hair of the deceased covers the area abundantly and it is my opinion neither of them looked at that place or shaved the hair." (HT79). He stated no basis for this opinion; he had expressed a lack of respect earlier for the work of Dr. Platt (see, e.g., HT37), although he had not commented on the work of Dr. Epstein.

We have now heard Dr. Aronson's testimony explaining the nature of the evidence he would offer in a new trial of these defendants. We have considered his testimony carefully; we have considered it, of course, in light of the extensive proceedings which have taken place in this matter. We have reviewed the transcripts of the trial testimony. We now set forth our findings of fact and conclusions of law.

## FINDINGS OF FACT

1. This evidence is "newly discovered." The defendants had no access to Dr. Aronson during trial.

2. The failure of defendants to discover this evidence is not attributable to a lack of diligence on the part of defendants or any person associated with them.

3. The medical evidence at trial was uniform in identifying a subarachnoid hematoma or hemorrhage as the cause of death.[22]

---

20. HT78. Dr. Hirsch testified at trial that his examination of the blood vessels at the base of the brain revealed only one incidence of damage. He removed this damaged blood vessel for further study. (TT, vol. 26, p. 4660). He testified that his microscopic examination of the injury to the vessel revealed that it was "artifactual"—that is, that it had occurred during the autopsy and was not in any way associated with the injuries causing the death of Joseph Topolosky. (TT, vol. 26, p. 4677).

21. Dr. Aronson referred directly during his testimony to the autopsy report of Dr. Platt (remarked for this hearing as DWM–6). At HT36 he acknowledged the following passage in the autopsy protocol:

The cervical spine is uncovered of its soft tissues posteriorly and shows a small area of hemorrhage within the muscles, just to the left of the midline at the level of the first

vertebra. It measures ¼". The transverse processes of the cervical vertebrae are uncovered of their soft tissues and an attempt is made to open the foramina to the vertebral arteries on both sides, posteriorly. In the process, no areas of hemorrhages are noted within the foramina. The cervical spine is removed posteriorly and no epidural or subdural hemorrhages are noted.

DMW–6, p. 4. Dr. Aronson testified that this discussion betrays an "inexperienced attempt" to expose the area where the Dimitri lesion could have been located.

The "foramina" referred to by Dr. Platt is that transverse portion of the cervical vertebrae through which the vertebral artery passes. See DWM–7, pp. 41–42, figures 1 and 2.

22. See TT, vol. 35, pp. 6323–24 (Dr. Lindenberg); vol. 33, p. 5934 (Dr. Lukash); vol. 24, pp. 4399–400, and Exhibit G–49 (Dr. Platt); vol. 26, p. 4679 (Dr. Hirsch).

4. No evidence was introduced at trial regarding the possibility that death could have been caused by a lesion involving a fracture of the atlas resulting in damage to the vertebral artery and, ultimately, a fatal subarachnoid hemorrhage.

5. No medical expert testified at trial to an opinion, held to a reasonable degree of medical certainty, that the manner of death was accidental.[23]

6. At the hearing on March 14, 1986, Dr. Aronson identified the possible mechanisms resulting in a "Dimitri" lesion as either an impact resulting from the automobile accident (the mechanism which he believes, to a reasonable degree of medical certainty, resulted in the injury),[24] or a single blow from a second person (the mechanism which he regards as unlikely, but which he is unable to rule out).[25]

7. There was extensive testimony at trial that defendant Messerlian had struck Topolosky about the head and neck;[26] this testimony did not locate with any precision the site on the head and neck where the blows fell.

8. The possibility that a subarachnoid hemorrhage could be caused by a single impact to the head or neck was the subject of extensive testimony in this case.[27] To the extent that Dr. Aronson's testimony is intended to offer a new theory that death could have resulted from a single impact, it constitutes evidence that is merely cumulative.

9. The possibility that serious injuries to the head and neck could have resulted from the motor vehicle accident was the subject of extensive testimony from medical experts in this trial.[28] To the extent that Dr. Aronson's testimony is intended to offer a theory as to the manner of death, it constitutes merely cumulative evidence.

10. The medical testimony in this case was such that the jury was not offered an opinion of an expert as to which impact, identified with which injury, caused the subarachnoid hemorrhage and ultimately death.

11. The medical evidence produced at trial was of death caused by one (or more) impacts or blows to the head or neck causing a subarachnoid hemorrhage and death. Dr. Aronson's description of a Dimitri lesion is entirely consistent with this description. The fact that he would hypothesize that this *particular* injury (as opposed to one described at trial) caused the subarachnoid hemorrhage is not material to the issues of the trial. In other words, it adds nothing material to the issues of the trial to hypothesize that an impact suffered in a motor vehicle accident or a blow from a flashlight caused a *Dimitri lesion* (as opposed to a fracture of the maxilla or a contusion to the side of the neck) and that death ensued.

12. Dr. Aronson offers no new *factual* evidence in this matter, but rather offers new expert opinion testimony based on the same factual evidence relied upon by the doctors who have previously testified.

---

**23.** The testimony at trial was to the effect that the manner of death was either homicide or undetermined. *See,* TT, vol. 35, pp. 6323–24 (Dr. Lindenberg: undetermined); vol. 33, p. 5934 (Dr. Lukash: undetermined); vol. 24, pp. 4399–400 (Dr. Platt: homicide); and vol. 26, p. 4681 (Dr. Hirsch: homicide).

**24.** HT30, 44, 85.

**25.** HT28.

**26.** The testimony of the civilian eyewitnesses was generally to the effect that they had seen defendant Messerlian enter the troop car and strike Topolosky several times. They had somewhat differing recollections; certainly none tes-

tified to the ability to state exactly where on Topolosky's body the blows landed. *See, e.g.,* TT, vol. 5, pp. 629–34 (Testimony of Abimael Fontanez); vol. 5, pp. 748–751 (Testimony of Gloria Ruiz); vol. 17, pp. 3136–42 (Testimony of Nelson Velasquez); and vol. 19, pp. 3445–48 (Testimony of Luis Guzman).

**27.** *See, e.g.,* TT, vol. 24, p. 4412 (Testimony of Dr. Platt).

**28.** *See, e.g.,* TT, vol. 35, pp. 6265–66, 6319, 6321, 6388–90, and vol. 36, pp. 6413, 6424 (Dr. Lindenberg); vol. 33, pp. 5933–34, 5989–92, 6000–02 (Dr. Lukash); vol. 24, pp. 4415–16, 4539–48 (Dr. Platt); vol. 26, p. 4682 (Dr. Hirsch); vol. 41, pp. 7184, 7227–28, 7274–76 (Dr. Sopher).

13. Dr. Aronson's opinion that the fatal injury was a fracture of the first cervical vertebra is poorly supported by the factual record of this case in that:

a) It depends on the existence of a fracture of the first cervical vertebra, a fracture not found by either of the doctors who performed the autopsies on the body;[29]

b) It depends on the existence of a rupture of a blood vessel in the network of blood vessels known as the circle of Willis. Such a rupture was not observed by any doctor who actually examined the brain; Dr. Hirsch, who performed close examination of the brain, testified that no such rupture existed;[30] and

c) It depends on the existence of an injury to the surface of the skin over the first cervical vertebra, an injury which was not observed by either of the doctors who performed autopsies on the body.[31]

14. The testimony of Dr. Aronson, insofar as it discusses the effect of the seepage of blood into the subarachnoid space on the affect of an injured person, is merely cumulative of other evidence in this trial.[32]

15. Were Dr. Aronson to testify before a petit jury in this matter, his credibility would be subject to question due to the nature of his prior statements, as we have discussed more fully in Part I(A) of this opinion. By this we mean to say that we believe that a jury would find that he had expressed, in 1984, an opinion substantially at variance with that he offers in 1986.

16. The testimony which Dr. Aronson offers is merely cumulative of that offered by the other medical experts who testified at trial.

17. The testimony which Dr. Aronson offers, if presented at a retrial of this matter, would be unlikely to produce an acquittal.

## DISCUSSION

We have found that the testimony offered by Dr. Aronson would not alter a jury's assessment of the evidence in this case. We believe that these findings can be summarized in two statements: first, the evidence is, in essence, merely cumulative of that previously presented to the jury; and second, the hypothetical nature of the testimony—the failure to tie the academic theory to the facts of the case—is such that a jury would be little persuaded by it.[33]

Defendants argue that the evidence is sufficient to entitle them to a new trial because Dr. Aronson testified to a reasonable degree of medical certainty that the manner of death was accidental—a conclusion new to the medical testimony of this case—and because he identified a new lesion which is consistent, in his opinion, with the evidence of this case.

We find the evidence cumulative, notwithstanding the new conclusion, because, absent the exotic name and complex description of the lesion advanced as the fatal injury, the testimony of Dr. Aronson discusses theories of the cause, manner and mechanism of death which were discussed throughout the trial.

The cause of death is universally agreed to be a subarachnoid hemorrhage. Dr. Aronson expressed the opinion that the manner of death is accident. He expressed the opinion that the mechanism of the fatal injury was an impact to the back of the neck after Topolosky had been propelled forward by the force of the vehicular accident. The jury in this case was presented

29. *See* footnote 21, *supra.*

30. *See* footnote 20, *supra.*

31. *See* HT79.

32. *See e.g.,* TT, vol. 32, pp. 5821–23, vol. 34, pp. 6108–11, 6125–28 (Dr. Lukash); vol. 24, pp. 4402–03 (Dr. Platt); vol. 26, pp. 4658 (Dr. Hirsch).

33. Counsel for the United States argues that this connection is so speculative that the testimony is not even properly admissible. The connection between the theory of a "Dimitri" lesion and the death of Joseph Topolosky is attenuated; we are hesitant to rule at this time, however, that the testimony would be inadmissible at trial.

with detailed testimony regarding the possibility that Topolosky could have suffered serious injuries to his head and/or neck as a result of the motor vehicle accident. There were, in fact, several in-court demonstrations regarding the possible mechanisms of such injuries. The jury also heard medical testimony to the effect that a fatal subarachnoid hemorrhage could result from a single blow to the head or neck. They also heard testimony regarding the possibility that bleeding in the subarachnoid space could cause unusual, even violent behavior. We must find that one additional explanation for the mechanism by which Topolosky could have suffered a serious injury to his head or neck as a result of a motor vehicle accident is cumulative.

We would not grant a new trial on the basis of Dr. Aronson's testimony even if it were not cumulative. Although Dr. Aronson couches his opinion in terms of a reasonable degree of medical certainty, we believe that a jury would regard it as little more than an educated guess. He was presented with reports and other evidence that the victim had been in a motor vehicle accident,[34] that eyewitnesses had reported that he had been beaten, perhaps with a flashlight, and that he had been pronounced dead a short time later. The medical reports indicated the presence of a large subarachnoid hemorrhage and several injuries to the head and neck. The reports also contained indications of violent behavior between the time of the motor vehicle accident and alleged beating. Dr. Aronson's review of this evidence brought to light no previously undiscovered injury or morphological finding.

Given essentially this evidence, Dr. Aronson identified the fatal injury as an obscure lesion which had been, in 1971, the subject of an article published in a scholarly journal and written by Dr. Aronson's former colleague. The mechanism for this lesion was identified by Dr. Aronson with the motor vehicle accident, although the injury was also consistent with a blow from a flashlight. The only apparent reason for Dr. Aronson's selection of the motor vehicle accident as the mechanism for producing the lesion is that this scenario would provide a neurological cause for the apparently aggressive behavior displayed by Topolosky after his arrest.

The jury would have to consider this opinion in light of the other medical evidence presented. That evidence was such that it would be faced with the fact that three medical predicates for Dr. Aronson's opinion are not supported by the record; that is, the record does not indicate the presence of a fracture of the atlas, an injury to the skin over the atlas, or a rupture of a blood vessel in the circle of Willis. Although the transverse processes of the cervical vertebrae were examined at autopsy, no fracture of the atlas was detected; although a number of lesions of the neck and head were detected at autopsy, no lesion was detected over the atlas; and although the very blood vessels identified as those which rupture in the case of a Dimitri lesion were examined by other pathologists, no rupture of any of these vessels was detected.

At a retrial of this matter, Dr. Aronson would be subject to cross-examination, as he was at the hearing on March 14. At that hearing, he was unable to provide a satisfactory explanation for the failure of his theory to locate a factual anchor in the evidence in this case.[35] He was also unable

---

**34.** During trial, the prosecution adduced evidence that the accident was relatively minor, while the defendants adduced evidence that the accident was quite violent. We believe that the balance of this evidence heavily favored the prosecution's characterization.

**35.** Dr. Aronson relied heavily on his theory that Dr. Platt performed an unsatisfactory autopsy because "he didn't want to upset the undertakers." (HT37). He testified that he knew "from

other material" at the time he formed his opinion that this was the case. (*Id.*) This other material is unidentified. Dr. Platt did testify at the trial that he had missed the fracture of the maxilla because he "didn't feel it was necessary to distort the body that much" (TT, vol. 23, p. 4244); Dr. Platt, of course, testified at this trial *after* Dr. Aronson had purportedly made his conclusions. These conclusions were made on the basis of the record supplied by Ms. Singer; Dr. Aronson testified that he has never spoken

to provide a satisfactory explanation for the positive inconsistency between the medical predicates for his theory and the medical evidence presented at trial.

We believe that a jury would find Dr. Aronson's opinion to be too speculative and abstract to be of any real value in the truth-seeking process. It would have at its disposal the more substantially supported opinions of Drs. Lukash, Platt, Lindenberg and Hirsch, all of whom had developed a more fact-based medical opinion in this case following extensive examination of the body of Joseph Topolosky and/or the records, reports and exhibits connected with the autopsies.[36]

## CONCLUSIONS OF LAW

Having found that the defendants are unable to establish two of the elements of the *Berry* test—that the evidence is noncumulative and that it would probably result in an acquittal if introduced at a retrial—we must conclude that the motion for a new trial based on new evidence must be denied.

## II. Inconsistent Verdicts

■ We now turn to the motion of defendant Wolkowski for a judgment of acquittal or for a new trial on the basis of the assertedly inconsistent nature of the verdict. Wolkowski was found guilty on Count 2 of the Indictment, which charges

all four defendants with conspiracy to obstruct justice in violation of 18 U.S.C. § 1503, and he was found not guilty on Count 4 of the Indictment, which charges Wolkowski with making a false declaration to the grand jury in violation of 18 U.S.C. § 1623. Defendants Mangione and Slattery were found not guilty of the conspiracy charge, and were also found not guilty of false swearing charges.

The key to Wolkowski's argument is that the "factual implications" of the verdict are such that there is insufficient evidence to sustain the conviction on Count 2.[37] He argues that we must (or that we may) excise from the facts in this case those which the jury must have rejected in order to reach the not guilty verdicts. The remaining evidence, Wolkowski concludes, does not support the verdict of guilty as to Count II.

The government responds to this line of argument by attacking its premises. It argues that the verdict does not require—indeed, does not *permit*—the court to disregard the evidence produced at trial to support the assertions contained in Overt Acts 3 and 6 of Count 2, which allege that Wolkowski "knowingly omitted" facts from a typed statement prepared following an interview of an eyewitness, and that he falsely swore that information regarding a beating was not related to him by the eyewitnesses.[38] In support of this argument,

36. Dr. Aronson testified that he regarded his five hours of work spent in reviewing the record of Joseph Topolosky's death to be adequate preparation for testimony at trial and, obviously, for the formulation of an opinion to a reasonable degree of medical certainty as to the cause and manner of death. The four doctors mentioned above had obviously undertaken a much more extensive factual study of this case.

to Drs. Platt, Epstein or Hirsch about this case. (HT79). Dr. Aronson did not explain the basis for his opinion that Dr. Epstein *also* failed to detect the fracture of the atlas which Dr. Aronson, assumes to have been present. It was, of course, Dr. Epstein who detected the fracture of the maxilla. (TT, vol. 23, pp. 4243–45; DWM–6, p. 6).

We find Dr. Aronson's guess that these two doctors failed to detect a fracture of the atlas to be a very slender reed to support a motion for a new trial.

37. These factual implications are identified in Wolkowski's Brief and Appendix in Support of Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, at pp. 5–6. They are:

1. That the jury found that Wolkowski, Mangione and Slattery testified *truthfully* that they had not been told on July 31, 1982 that the civilian witnesses had witnessed a beating; 2. That the jury found that there had been no conspiracy to discredit the testimony of the civilian eyewitnesses; and 3. That the conspiracy to obstruct justice which the jury found to exist was unconnected to the statement-taking process of July 31, 1982.

38. Overt Act 3 of Count 2 states:

On or about July 31, 1982, defendants HENRY F. WOLKOWSKI, GEORGE J. MAN-

the government relies on *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (December 10, 1984). In that case, the United States Supreme Court reaffirmed the rule of *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). In *Dunn*, the Court was faced with a verdict by which a jury had found a defendant *guilty* of keeping liquor for the purpose of offering it for sale, but *not guilty* of possession, or of sale of the liquor. Although the verdict was logically irreconcilable, the Court found that it could not be attacked on that basis. It stated that:

> Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.
>
> \* \* \* \* \* \*
>
> "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through leniency."

284 U.S. at 393, 52 S.Ct. at 190 (*quoting Steckler v. United States*, 7 F.2d 59, 60 (C.C.A.2d 1925)).

The Court in *Powell*, faced with a similarly inconsistent verdict, reaffirmed this view. It stated that criminal defendants may not benefit by an assumption that the not guilty verdict was correct while the guilty verdict was in error. It also rejected recourse to arguments going to the *reason-ing* of the jurors in reaching their inconsistent verdict.

> Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally would not undertake ... [W]ith few exceptions, once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment.

105 S.Ct. at 478 (Citations omitted).

Wolkowski responds by arguing that *Powell* is simply not applicable to this case. He argues that his theory does not depend on the *inconsistent* nature of the verdicts, but rather utilizes the not guilty determinations to pare down the evidence by eliminating that which the jury must have rejected. Wolkowski argued that the prosecution is barred or estopped in some fashion from relying, in opposing these post-trial motions, on evidence adduced at trial in support of the false swearing charges.[39] He argued that the jury had rejected the government's theory that Wolkowski, Mangione and Slattery conspired on the night of July 30 or the morning of July 31, 1982 to falsify the statements of the civilian eyewitnesses, and that it had also rejected the theory that these three defendants had continued this conspiracy through their testimony before the federal grand jury. He also argued that the evidence still available to the jury after it had rejected this portion of the case was insufficient to locate Wolkowski within a conspiracy to obstruct justice.

GIONE, and BRIAN J. SLATTERY interviewed three (3) of the eyewitnesses to the assault; thereafter the defendants typed statements for the witnesses to sign and knowingly omitted from the statements the fact that the witnesses had observed HARRY H. MESSERLIAN assault Joseph Topolosky.

Overt Act 6 of Count 2 states:

Defendants HARRY F. WOLKOWSKI (April 11, 1985), GEORGE J. MANGIONE (March 28, 1985), and BRIAN J. SLATTERY (April 4, 1985) made false material declarations before a federal grant [sic] jury on the dates indicated after their names concerning their inter-views on July 31, 1982 of the three (3) eyewitnesses to the assault, which testimony falsely stated, among other things, that the eyewitnesses did not report that they had observed HARRY H. MESSERLIAN assault Joseph P. Topolosky.

39. *See, e.g.*, Wolkowski's Brief and Appendix in Support of Motion for a Judgment of Acquittal or, in the Alternative, for a New Trial, pp. 14–16; Transcript of post-trial motions, March 25, 1986, pp. 131–133.

We find that this theory is nearly identical to that advanced before the Supreme Court in *Powell*, in which the defendant below argued that an acquittal on a predicate offense "necessitates a finding of insufficient evidence on a compound felony" based on that predicate felony. 105 S.Ct. at 478. The court found that this argument "falls of its own weight." *Id.* It is simply inconsistent with the reasoning of *Powell* to argue that we should gauge the sufficiency of the evidence supporting a conviction in this case only after we delete that evidence introduced in support of the overt acts which formed the basis of the substantive count of which Wolkowski was found not guilty. The Court in *Powell* rejected this reasoning:

> [The] argument that an acquittal on a predicate offense necessitates a finding of insufficient evidence on the compound felony count simply misunderstands the nature of the inconsistent verdict problem. Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent. The Government could just as easily—and erroneously— argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient.

105 S.Ct. at 478. In reaching its decision, the Supreme Court specifically disapproved of Circuit Court decisions which had attempted to carve out exceptions to the *Dunn* rule. 105 S.Ct. at 475, discussing *United States v. Morales*, 677 F.2d 1 (1st Cir.1982); *United States v. Hannah*, 584 F.2d 27 (3d Cir.1978). We believe that the facts of this case fit squarely within the *Dunn/Powell* rule, and we therefore reject any argument premised on the adoption of the purported reasoning of the jury.

In his letter brief of March 5, 1986, Wolkowski appears to withdraw, to a large extent, from his reliance on the "inconsistent" nature of the verdicts for support of his Rule 29 and 33 motions. Rather, he cites the following language from *Powell* in support of his argument that this court should guard against irrational verdicts:

> [W]e note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency of the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. *This review should be independent of the jury's determination that evidence on another count is insufficient.* The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

105 S.Ct. at 478 (citations omitted; emphasis added). We believe that *Powell* holds that we are precluded from considering the "factual implications" of the jury verdict in assessing either the weight or the sufficiency of the evidence. We find, then, that the "inconsistent" nature of the verdicts does not inform our decision. The "inconsistent verdicts" argument having been rejected, Wolkowski's motion for a new trial or for a judgment of acquittal is, like defendant Messerlian's, a renewal of motions made at the close of the Government's case.

### III. Renewed Rule 29 and Rule 33 Motions

We now turn to the motions of defendants Messerlian and Wolkowski for judgments of acquittal or for new trials on bases unrelated either to the nature of the

verdict or any evidence which came to light following the trial. Wolkowski argues that the evidence was insufficient to support the verdict as to Count 2. He also urges that the denial of his previous motions for a severance of his trial from that of Messerlian was a fatal error, and that the jury charge as to Count 2 was improper. He also contends that he should be granted a new trial on the basis of the weight of the evidence. Defendant Messerlian makes no new arguments in support of his renewed motion, but merely reincorporates those made previously. We first address Wolkowski's arguments.

In assessing Wolkowski's renewed Rule 29 motion, we must determine "whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt." *Powell*, 105 S.Ct. at 478; *see United States v. Lowell*, 490 F.Supp. 897, 901 (D.N.J.1980) *aff'd* 649 F.2d 950 (3d Cir.1981). He argues that the evidence is insufficient to support a finding that a unitary conspiracy existed, that Wolkowski was a member of that conspiracy, and that the conspiracy had the goal of obstructing a federal proceeding. Much of the argument presented in support of this motion depends on our declining to consider, in deciding this motion, evidence adduced in support of Count 4 of the indictment. As we have held in Part II, *supra*, we are constrained by the *Dunn/Powell* rule to consider *all* of the evidence presented at trial; we will not interpret the jury's verdict as a finding as to, *e.g.*, the truthfulness of Wolkowski's testimony before the grand jury.

When last we addressed this issue, we found that the evidence was sufficient to support the conspiracy Count. Relying on *United States v. Maker*, 751 F.2d 614 (3d Cir.1984) and *United States v. Riccobene*, 709 F.2d 214 (3d Cir.1983), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145, we found that the government had produced evidence sufficient for a rational juror to find a unitary conspiracy with the goal of preventing "disclosure of the events surrounding the alleged assault." (TT, vol. 29, p. 5080). We also found that there was

evidence supporting the government's theory that the conspiracy aimed at preventing disclosure to "all comers," and that it continued to operate in such a manner so as to obstruct federal proceedings. We found that the holding of *United States v. Perlstein*, 126 F.2d 789 (3d Cir.1942) is that this conspiracy, if proven to exist, runs afoul of 18 U.S.C. § 1503. (TT, vol. 29, pp. 5080–81).

Wolkowski argues that the evidence is insufficient to connect him to any conspiracy to impede justice or protect Messerlian from prosecution. He argues that a fair assessment of the evidence compels the conclusion that the jury returned a guilty verdict against him based either on his close association with Messerlian or based on speculation or surmise. Either ground is, of course, improper. *United States v. Samuels*, 741 F.2d 570 (3d Cir.1984); *United States v. Fitzharris*, 633 F.2d 416 (5th Cir.1980). We have reexamined the evidence presented during the course of the trial. We reaffirm our finding that the evidence is sufficient to allow the jurors to find a unitary conspiracy, and that Wolkowski was a member. Given our finding that we must examine the entire record in connection with this motion, and that we may not excise that portion which Wolkowski argues the jury "rejected," there is no need for a recapitulation of the analysis supporting our prior denial of this motion. (*See* TT, vol. 29, pp. 5079–82a).

We now address Wolkowski's Rule 33 motion, pursuant to which we examine the weight, rather than the sufficiency of the evidence in order to determine whether a new trial is warranted. *See Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). We have examined the argument presented with respect to the jury charge on Count 2. We find that the charge is consistent with *United States v. Perlstein*, *supra*, which stands for the proposition that a conspiracy to obstruct justice, which at some point adopts the specific goal of obstructing a federal proceeding, may properly be charged in an indictment against the members as a con-

spiracy to obstruct a federal proceeding.[40] We find that a jury could rationally find that the conspiracy existed, and that it continued to operate so as to attempt to obstruct a federal investigation; we believe that they were properly charged as to the elements of Count 2.

We similarly reaffirm our decision as to the severance motion. We recognize the seriousness of this argument; we continue to believe, however, that the jury was able to compartmentalize the evidence and fairly analyze the guilt, or lack thereof, of each defendant. This belief has been buttressed by the nature of the jury's verdict, by which it returned findings of not guilty as to defendants Slattery and Mangione on counts nearly identical to those faced by Wolkowski. We reject Wolkowski's argument that he was in a position, with respect to severance, significantly different from that of Mangione or Slattery.

Wolkowski argues that this case presents a *"Dansker* problem." *United States v. Dansker,* 537 F.2d 40 (3d Cir. 1976). He argues that the jury verdict calls into question what may be called the linchpin evidence of his membership in the conspiracy. We read *Dansker* and related cases (*see, e.g., United States v. Gallagher,* 576 F.2d 1028 (3d Cir.1978) as holding that a new trial should be granted where proof of an essential element of a count has been struck as a matter of law. It should be evident at this point that we do not view the not guilty verdict as to Count 4 as the equivalent of a legal ruling striking Overt Acts 3 and 6 of Count 2 from the indictment. Viewed in light of *Powell,* this case does not present a *"Dansker* issue."

The final argument presented by Wolkowski is an appeal to the conscience of the court. We appreciate the genuine spirit with which this request is made. We assure Mr. Wolkowski that we have approached this matter as one presenting grave issues—not the least of which are the potential penalties, whether imposed by this court or others—which have arisen as a result of the guilty verdict. Wolkowski has argued that we must review this Rule 33 motion as though we were sitting as a "thirteenth juror." We are familiar with this rhetorical description of the process; we wish to point out, however, that it is a misleading one. In weighing the evidence presented in this matter, we are permitted by the rule to grant a new trial "in the interest of justice." As the rule has been interpreted, our discretion does not extend to the grant of a motion if the evidence were to fail to convince us of guilt beyond a reasonable doubt—as it would if we were to sit as a juror. Rather, we are empowered to grant a new trial if we are convinced that the evidence is such that the verdict of the jury was not "rational," *Powell,* 105 S.Ct. at 477, or if the verdict is against the weight of the evidence.

We heard the testimony as it was admitted during the three months of this trial. We have examined and reexamined the evidence, in light of the demeanor and credibility of the witnesses, and we simply can-

---

**40.** It cannot be argued that the obstruction of the federal grand jury cannot be "fairly attributed" to Wolkowski. Overt Act 6 alleges, and evidence was introduced to prove, that Wolkowski gave false testimony before the federal grand jury. We find the discussion of § 1503 in *United States v. Moon,* 718 F.2d 1210 (2d Cir. 1983) inapposite to this case. In *Moon,* the Second Circuit held that a defendant's production of falsified documents to a grand jury pursuant to a subpoena was not in violation of § 1503, in part because the production was compelled, and no "corrupt" intent was shown. We similarly find unpersuasive the reference to *United States v. Brand,* 775 F.2d 1460 (11th Cir.1985), in which the court reversed a conviction for obstruction of justice, ruling that the

seeking out of testimony prior to trial, which testimony was never produced, does not constitute a violation of § 1503. In this case, evidence was presented which would allow a jury to find that Wolkowski engaged in concerted activity, including false statements before a federal grand jury, which was calculated corruptly to obstruct the investigation into the death of Joseph Topolosky. *See, e.g., United States v. Griffin,* 589 F.2d 200 (5th Cir.1979) *cert. denied,* 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32. The evidence was sufficient to allow the jury to determine that Wolkowski took an active role in the alleged attempt to discredit the testimony of the civilian eyewitnesses. We find this evidence sufficient to support the verdict.

not in good conscience find that the decision was against the weight of the evidence.

Defendant Messerlian raises no new arguments or issues. The main thrust of Messerlian's pre-trial motions, as well as his motion for acquittal following the government's case, was that Count 1, which charges that he wilfully deprived Joseph Topolosky of liberty without due process of law—by administering summary punishment—fails to charge a violation of federal law. We addressed these issues pre-trial and again at the close of the government's case. (*See* TT, vol. 29, pp. 5060–70). On the latter occasion we concluded that sufficient evidence had been adduced, both from eyewitnesses and expert testimony, to allow the jury to find a violation of 18 U.S.C. § 242. We have reviewed the record of this case, and we reaffirm that determination. Counseled primarily by *United States v. Dise*, 763 F.2d 586 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985) and *United States v. Delerme*, 457 F.2d 156 (3d Cir.1972), we find that ample evidence was presented which would allow a rational juror to find that Messerlian's conduct constituted a criminal violation of Joseph Topolosky's civil rights. The court in *Dise* held that the intent element of § 242 is satisfied if a defendant "acted in reckless disregard of the law as he understood it," even if he was not thinking in constitutional terms. We find that the record amply supports the inference that Messerlian acted "intentionally" within the meaning of *Dise*. (*See,* TT, vol. 29, pp. 5064–65). We reaffirm our prior analysis of the evidence presented during the course of our denial of the Rule 29 motion at the close of the government's case. At that time we found that,

> the record allows a reasonable juror to conclude that, one, Messerlian administered the blows which have been described by the medical experts; and two, that he did so not for any legitimate police purpose, such as for the protection of persons or property, but rather for the purpose of administering punishment.

We find that the evidence adduced in the government's case could allow the jury to find beyond a reasonable doubt that Messerlian administered "a physical beating as punishment for allegedly breaking the law [, acting] as prosecutor, judge, and jury." *United States v. Delerme*, 457 F.2d 156, 161 (3d Cir.1972). (TT, vol. 29, p. 5068). We reject the argument, for the reasons we have expressed on previous occasions, that there was a failure of proof either as to Messerlian's intent to deprive the victim of his rights, or as to the nature of Messerlian's conduct as rising to the level of a constitutional violation.

For the reasons stated above, we deny Wolkowski's and Messerlian's renewed Rule 29 motions, and their motions for a new trial.

## CONCLUSION

We find that all post-trial motions must be denied. The evidence presented was sufficient to support the verdict; we have weighed the evidence and we find that a new trial is not warranted. We have rejected the post-trial evidence of Dr. Aronson. We find that he did not testify truthfully when he claimed the United States Attorney's Office concealed exculpatory evidence, that the "new evidence" which he now offers is merely cumulative of that previously considered, and that it would not affect the jury's verdict on retrial.

Implicit in these conclusions is the finding that Messerlian and Wolkowski received a fair trial. They were given considerable latitude in presenting evidence to the jury. Their cases were vigorously and intelligently presented by able counsel.

The evidence presented against the defendants, on the other hand, was substantial and compelling. We believe that the task left for the jurors after the completion of the presentation of evidence, was a difficult one. The length of their deliberations, the nature of their requests for information during those deliberations, and the nature of the verdicts leads to the conclusion that

they intelligently and seriously examined the evidence and, as is their proper function, made the difficult factual determinations.

We find that the jury verdicts were proper, appropriate and fully supported by the evidence. We recognize that the verdicts have unhappy implications for everyone within the criminal justice system. They bring into sharp focus abuses of power and authority by persons sworn to protect the public welfare. However, only if the criminal justice system polices itself can it maintain the respect of the society it seeks to serve.