**UNITED STATES of America, Appellee,**

v.

**Frank ZIMMITTI and James Strano, a/k/a "Jimmy", Defendants–Appellants.**

**Nos. 1113, 1169, Dockets 87–1441, 87–1448.**

United States Court of Appeals, Second Circuit.

Argued May 5, 1988.

Decided June 9, 1988.

John H. Durham, U.S. Dept. of Justice, New Haven, Conn. (Stanley A. Twardy, Jr., U.S. Atty., D. Conn., New Haven, Conn., Robert J. Devlin, U.S. Dept. of Justice, New Haven, Conn., on the brief), for appellee.

Gary D. Weinberger, Asst. Federal Public Defender, Hartford, Conn. (Thomas G. Dennis, Federal Public Defender, D. Conn., Hartford, Conn., on the brief), for defendant-appellant Zimmitti.

James Strano, Springfield, Mo., defendant-appellant pro se, joined the brief of defendant-appellant Zimmitti.

Before LUMBARD, OAKES, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Frank Zimmitti and James Strano appeal from so much of the judgments entered against them in the United States District Court for the District of Connecticut, following a jury trial before M. Joseph Blumenfeld, *Judge,* as convicted them on one count of conspiring to use (count 3 of the superseding indictment), and one count of using (count 4), extortionate means to attempt to collect an extension of credit to one Philip DiPietro, in violation of 18 U.S.C. § 894(a)(1) (1982). Zimmitti was sentenced to, *inter alia,* two eight-year prison terms on counts 3 and 4 and fined $10,000 on count 3. Strano was sentenced to, *inter alia,* two five-year prison terms on counts 3 and 4 and fined $5,000 on count 3. With respect to count 3, each defendant's prison term was to run consecutively to concurrent sentences imposed for his convictions on counts 1 and 2 of the superseding indictment, which charged defendants with similar offenses against one Gary Bunis. On appeal, Zimmitti and Strano contend that the evidence was insufficient to convict them of using or conspiring to use extortionate collection methods with respect to DiPietro. We agree and reverse the convictions entered on counts 3 and 4.

## I. BACKGROUND

Zimmitti and Strano were named in a four-count superseding indictment charging them with four offenses in violation of 18 U.S.C. § 894(a)(1). Count 1 charged that they conspired to use violence and threats of violence to attempt to collect an illegal gambling debt from Gary Bunis; count 2 charged that they used such means against Bunis. Count 3 alleged that they conspired to use violence and threats of violence to attempt to collect an illegal gambling debt from Philip DiPietro; count 4 alleged that they used such means against DiPietro, in violation of § 894(a)(1) and 18 U.S.C. § 2 (1982). Only counts 3 and 4 are at issue on this appeal.

All of the charges arose out of defendants' efforts to collect debts owed to bookmaker Victor ("Chip") Galati, who was named as a codefendant on counts 1, 3, and 4. The government's case with respect to the alleged acts against DiPietro was presented principally through the testimony of DiPietro and Galati's former business partner, Bruce Gaunya.

### A. *The Gambling Operation*

Gaunya testified that in 1984, he and Galati had become partners in an illegal bookmaking operation in Connecticut. In March 1986, they were summoned to a meeting that led to the dissolution of their partnership. At the meeting, they met Zimmitti and Strano. Zimmitti told Gaunya and Galati, "[Y]ou're going to be with us now," and informed them that they would be allowed to continue their bookmaking operation if they paid Zimmitti $200 per week or made a lump-sum payment of $10,000. After this meeting, Gaunya and Galati disagreed over whether they should pay the money. As a result, they ended their partnership on April 1, 1986, and each continued in business separately.

Galati paid Zimmitti $5,000; Gaunya paid him nothing. On October 27, 1986, an unidentified person fired three bullets into Gaunya's house. When Gaunya told Galati about the shooting, Galati responded, "What did you think was going to happen?" Galati reported that his business dealings with Zimmitti had proven to be "worth his while" and advised that Gaunya's problem would be ameliorated if Gaunya would "take care of the people here." Gaunya believed this comment referred to Zimmitti.

### B. *The DiPietro Debt*

DiPietro testified that prior to January 1987 he had placed bets with Gaunya and Galati for some two years. He was aware that Gaunya and Galati had been partners during part of that time and that they had severed their partnership. On his continued bets with Galati he sometimes won and sometimes lost. On occasion DiPietro had taken as many as four or five months to pay a debt and had had no problems making these arrangements. Galati would call periodically, inquiring as to when DiPietro could pay, but was always willing to wait. When DiPietro owed money, he sometimes made the payments directly to Galati and sometimes to a man who appeared to be Chinese and who collected debts for Galati. DiPietro would meet this man, whose name he did not know, "[a]nywhere; parking lots or whatever."

In October 1986, DiPietro owed Galati $10,500. He paid $500 per week until, in November 1986, he became unemployed; his debt was then $8,500 and he was unable to pay it. In December, he and his girlfriend left Connecticut for about a month, returning in January 1987. DiPietro testified that he wasn't running away from anybody: "We just left because we wanted to leave for awhile [*sic*]." Upon his return, DiPietro received a call from Galati, who inquired as to when the debt would be paid.

DiPietro had always been willing to pay his debts to Galati and would have paid this time if he had had the assets. He testified that in January 1987, Galati "was willing to wait, but he wanted to know as soon as possible when I could pay." The prosecutor asked, "Did Chip Galati's conduct of his business change after he had severed his partnership with Bruce Gaunya?" DiPietro answered, "No, he seemed to have

changed, but I couldn't quite put my finger on it. He seemed to."

Galati arranged to meet DiPietro in January at a McDonald's restaurant in Newington, Connecticut, to work out a plan for payment of the debt. At the meeting, Galati was accompanied by Zimmitti, introduced only as "Frank," and another person. DiPietro explained that he had no assets and no ability to pay his debt. At the conclusion of the meeting, DiPietro was told that "[s]omeone" would contact him within two or three weeks to discuss a plan for payment of the debt. DiPietro testified that this was similar to the way he had done business with Galati in the past.

Later in January, DiPietro was summoned to another meeting at the same McDonald's. This meeting was attended by Zimmitti and Strano, whom Zimmitti introduced only as "Jim." Galati was not present. Zimmitti and Strano asked when DiPietro would be able to pay the money he owed to Galati. No agreement was reached as to when he would pay; DiPietro told them he was still unemployed and without any assets with which to pay the debt, but that he would be going back to work in March or April and would be able to pay then.

DiPietro testified that after these two meetings in January, he never saw or spoke to Galati or any of his representatives again. The government introduced evidence obtained from a telephone pen register indicating that between March 6 and March 29, 14 calls had been placed from Strano's home telephone to the DiPietro residence. The pen register, however, is incapable of indicating whether an outgoing call has been received at the other end. DiPietro testified that in late March, after he had gone back to work, his girlfriend had fielded calls on "maybe one or two" occasions, taking the message that "Jim called" and would "call back later." DiPietro stated that he had not been "ducking" the calls but simply was not at home because he was working; he felt fortunate, however, not to be at home when the calls came, because he was not ready to resume paying.

At DiPietro's meeting with Zimmitti and Strano, defendants had asked whether anyone owed money to DiPietro. DiPietro told them that Gaunya owed him $100. Zimmitti and Strano said nothing further to DiPietro in that regard. The government introduced at trial a surveillance tape of a meeting that took place on March 16, 1987, among Bunis, a coworker, and Strano. Strano told Bunis, "You get ahold of [Gaunya], and you tell him he stiffed a guy for 1900, 17 or 1900, it's a guy Phil [in Newington]. And he's gotta pay it.... Tell him if he wants to stay on the good side of us, to go pay [Phil]." A videotape of a March 30, 1987 meeting among the same parties showed Strano stating, of the debt from Gaunya, "We finally figured it out. We dropped it down to 1100.... We're gonna rehash it with [DiPietro].... It came down to eleven. 'Cause we told him, 'Don't lie.'" Gaunya testified that in early 1987 his debt to DiPietro was $130.

## C. *The Bunis Debt*

The government's proof with regard to the extortionate acts against Bunis was presented through the testimony of Bunis, his coworker John Pollard, Gaunya, and videotapes made by law enforcement officers after Bunis had complained to the authorities.

On April 1, 1986, Bunis owed the Gaunya/Galati partnership $22,050 in illegal gambling debts. After the partnership dissolved, he apparently owed half of this amount to each of the partners. Bunis testified that on July 21, 1986, he was visited at his office by three men he had never seen before, two of whom were later identified as Zimmitti and Strano. Strano told him, "You owe me $22,000." Bunis replied that he owed Gaunya $22,000 and that he would have to speak with Gaunya before discussing the matter further with Strano. Bunis asked an employee to call the police. Pollard testified that Strano struck him in the face, then threw a metal rolodex at Bunis's head, and said, "If you call the police, I will blow your fucking head off." In the ensuing conversation, Strano made clear that he was representing

Galati and claiming a debt of only $11,000. It was agreed that Bunis would pay the debt in installments beginning the following month, and the three visitors left.

Bunis testified that although in previous dealings with the Gaunya/Galati partnership he had sometimes been slow in paying debts as large as $10,000, he had never before been visited by a debt collector. Gaunya testified that during his October 27 conversation with Galati, he asked Galati to stop harassing Bunis. Galati replied, "I'm going to get my money."

### D. *The Verdicts*

Neither Zimmitti nor Strano presented any evidence in his own behalf. The jury found them guilty on all four counts charged in the indictment. In addition to being ordered to pay various fines, assessments, and restitution, Zimmitti was sentenced to an eight-year prison term on each count, and Strano was sentenced to a five-year prison term on each count. With respect to counts 1 and 2 (the Bunis counts), the prison terms were to be served concurrently. With respect to count 3 (the DiPietro conspiracy count), each defendant's prison term was to be served consecutively to the terms imposed on counts 1 and 2; with respect to count 4 (the DiPietro substantive count), each defendant's prison term was to be served concurrently with the terms imposed on counts 1, 2, and 3.

These appeals followed, with both defendants arguing that the evidence was insufficient to support their convictions of using or conspiring to use extortionate collection methods against DiPietro. For the reasons below, we agree and reverse the convictions on counts 3 and 4.

### II. DISCUSSION

Section 894(a)(1) of 18 U.S.C. makes it unlawful to "knowingly participate[ ] in any way, or conspire[ ] to do so, in the use of any extortionate means ... to collect or attempt to collect any extension of credit." 18 U.S.C. § 894(a)(1). "An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause

harm to the person, reputation, or property of any person." *Id.* § 891(7). This Court has observed that "the term 'other criminal means' was meant to supplement the context of 'violence' " and that in passing the statute, "congress was concerned primarily with the use of actual and threatened violence by members of organized crime engaged in loan sharking...." *United States v. Pacione,* 738 F.2d 567, 571–72 (2d Cir.1984). We have ruled further that "[i]t is [the] 'calculated' use of threatening gestures or words to collect credit extensions which Congress has made criminal.... In other words, it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed." *United States v. Natale,* 526 F.2d 1160, 1168 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976).

In challenging the sufficiency of the evidence that violence was used or threatened, explicitly or implicitly, against DiPietro, Zimmitti and Strano have a heavy burden. In reviewing that evidence, we must credit every inference that could have been drawn in the government's favor, and we must affirm the conviction if, from the inferences reasonably drawn, the jury might fairly have found the use of such means beyond a reasonable doubt. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Taylor,* 464 F.2d 240, 245 (2d Cir.1972). In the present case, even viewing the evidence in the light most favorable to the government, we conclude that no rational juror could have found beyond a reasonable doubt that Zimmitti or Strano expressly or impliedly used or threatened violence against DiPietro.

The government concedes that, with respect to DiPietro, there were no explicit or express threats and that none of the conduct of Zimmitti or Strano was manifestly threatening. Rather, it argues that the

jury could have inferred implicit threats against DiPietro from a number of factors: (1) the jury's "own in-court observations of the demeanor and character of the defendants Zimmitti and Strano," (2) the "evidence in the case that the defendants Zimmitti and Strano were intimidating men," and that "their livelihood revolved around their forcing people to pay them money," (3) the inference that Galati's use of an agent to collect was unprecedented, (4) the circumstances of meeting "Frank" and "Jim," with no last names given, "were such as to convey implicit threats that violence would be used if payment was [sic] not made on the illegal debt," (5) the fact that DiPietro "left the state for a month when he was without funds to make payment on the debt," (6) the suggestion that DiPietro's home was the recipient of not just one or two calls but "rather was the recipient of repeated calls throughout the month of March, 1987," (7) the fact that DiPietro was pleased not to be at home when the calls came through, (8) an inference that DiPietro lied to Zimmitti and Strano about the size of Gaunya's debt to him because DiPietro was "fearful," and (9) an inference that, in describing defendants' conduct toward him in a way that appeared accommodating, DiPietro "was less than completely forthcoming with respect to the events surrounding the collection efforts undertaken by the defendants," because he was "concerned and alarmed about his predicament." We find the government's arguments unpersuasive.

Many of the inferences suggested by the government are contradicted by DiPietro's testimony and are not supported by any evidence. For example, DiPietro's leaving the state for a month surely did not support an inference that Zimmitti and Strano implicitly threatened force against him. Even if his departure were not "apparently to go on vacation," as the prosecutor said in summation, the timing belies any connection with these defendants, for DiPietro left Connecticut for the month of December 1986; he was not introduced to Zimmitti and Strano until January 1987, after his return. The argument that Galati's use of others to collect debts for him was unprece-dented is squarely contradicted by DiPietro's testimony that on many occasions in the past he had paid a man who collected for Galati. This history also contradicts the government's contention that the circumstances of the Zimmitti/Strano introduction—i.e., meeting in a McDonald's, the first-name-only basis, and the questions as to when he would be able to pay—were inherently threatening. Even prior to January 1987, DiPietro had paid debts he owed to Galati through a Chinese man who collected for Galati; it seems unlikely that names played a significant role in the collection process, for though DiPietro had paid the Chinese man on several occasions he could not give his name; and he had met the man "[a]nywhere; parking lots or whatever." Nor was this the first occasion on which Galati made calls inquiring as to when DiPietro would be able to pay. He had done so periodically in the past and had always been willing to wait. In January 1987, according to DiPietro, Galati similarly said he was willing to wait though he did want to know as soon as possible when DiPietro could pay. In sum, according to DiPietro, though Galati himself seemed to have changed in a way that DiPietro could not put his finger on, his method of doing business had not changed.

■ Further, several of the arguments made by the government rely on inferences that, given the record in this case, simply are impermissible as a matter of law. For example, the suggestion that the jury could have inferred implicit threats from their own in-court observations of the demeanor and character of Zimmitti and Strano must be rejected. The record shows nothing of their demeanor or of any display of character in court. It does indicate that Strano was taller and heavier than the average man, but to permit from such a fact an inference that violence was implicitly threatened would suggest that it is a crime simply for a large person to be a bill collector.

■ Nor do we find tenable the government's suggestion that the jury was entitled to infer implicit threats against DiPietro from the "evidence in the case that the defendants Zimmitti and Strano were intim-

idating men," and that their "livelihood revolved around their forcing people to pay them money." The evidence referred to by the government is the proof of actual acts and explicit threats of violence against Bunis and Gaunya, not against DiPietro. Under Fed.R.Evid. 404(b), however, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The fact that these defendants actually struck or threatened other persons does not serve as proof that words they directed to a person who describes their words and actions as accommodating were actually implicit threats. *See United States v. Robinson*, 545 F.2d 301, 304 (2d Cir.1976).

■ The weakness of the government's case on the counts concerning DiPietro is revealed in the prosecutor's summation. Unable to point to any violence or threats against DiPietro, the government argued principally as follows:

> DiPietro's testimony is that he got a call from Galati and Galati wanted him to meet him.

> He meets with him in a MacDonald's *[sic]* Restaurant on the Berlin Turnpike. He gets there and Galati introduces him to Mr. Zimmitti, except that he only gives him his first name.

> ....

> It is in January of 1987 that Chip is introducing Mr. Zimmitti in this situation.

> And then later on January 12, he gets a call from somebody that knows Chip. He wants to set up another meeting and at this next meeting, Mr. Zimmitti is there and he introduces Mr. DiPietro to Jim.

> Now, what was the purpose of that, if it's not to make an outright threat, it's to have somebody go and lean on him—two people that you don't even know and say that they want to talk to you about you paying your debt.

> There is only one purpose for that. That is that Mr. Galati was using these people to collect that money.

Perhaps defendants did "lean on" DiPietro in the sense of urging him to pay, though continuous urging is surely not inferrable

from DiPietro's testimony (he told them in January he would not be able to pay until he went back to work in late March; he did not hear from them again until late March). And certainly Galati was using Zimmitti and Strano to collect the debt. But importuning in order to collect does not violate § 894(a)(1) unless the means of collection were extortionate, and the government is unable to point to any conduct toward or statement to DiPietro in which a threat was implicit. Had this record included none of the evidence of defendants' conduct toward Gaunya and Bunis, we strongly suspect Zimmitti and Strano would have been acquitted.

■ At trial, the government apparently sought to suggest that DiPietro knew of the violence and threats of Zimmitti and Strano against others and hence sensed such threats implicit in defendants' conversations with him. Thus, the prosecutor asked him, "Sir, prior to meeting with Chip Galati and Frank Zimmitti in January ... did you have occasion to talk to Bruce Gaunya about Mr. Galati and some of his new associates?" DiPietro answered, "Yes, I did." The prosecutor then asked, "And, in January of 1987 then, when you met with Mr. Galati and Mr. Zimmitti and subsequently with Mr. Zimmitti and Jim, do you recall, sir—you knew then at that time what Gaunya had told you, correct?" DiPietro answered, "Yes." Further exploration of precisely what Gaunya had said and what DiPietro knew was forestalled by a hearsay objection. The scant information elicited by the questions that were asked plainly did not provide an adequate basis for inferring any particular knowledge, awareness, or inferences on the part of DiPietro. The mere fact that at some unspecified time between April 1, 1986 and January 1987, Gaunya told DiPietro something, did not permit the jury either to speculate on what was said or to infer on the basis of unstated and inadmissible information that DiPietro knew that violence had been perpetrated and threatened by Zimmitti and Strano against others. Had there been evidence that Zimmitti or Strano told DiPietro to speak with Gaunya or Bunis to confirm the desirability of paying the debt, this would be a different case. But

there is no evidence of any such statement or indeed of any knowledge on the part of the defendants of the content of any conversation between DiPietro and Bunis or Gaunya.

 Nor are we persuaded by the government's argument that the jury could have inferred implicit threats by concluding that DiPietro was "less than forthcoming" at trial with respect to defendants' statements to him. " 'When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.' " *United States v. Tyler,* 758 F.2d 66, 70 n. 3 (2d Cir.1985) (quoting *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)). The government was not entitled to prove that the defendants made threats to DiPietro simply by putting him on the stand, allowing him to indicate that no threats were made, and asking the jury to disbelieve that testimony.

The remaining inferences urged by the government, *i.e.,* those that are not squarely contradicted by DiPietro's testimony and that are not impermissible as a matter of law, are extremely weak as a matter of logic. For example, the fact that DiPietro was pleased not to be at home when Strano called before he was able to repay the debt hardly supports the conclusion beyond a reasonable doubt that there had been threats of violence if he did not pay. If the debtor cannot yet afford to pay, as DiPietro testified was his plight, it seems quite a normal reaction to feel relief at having missed a dunning call even from the most benign of bill collectors. Nor, assuming that DiPietro exaggerated the debt that Gaunya owed him, does the fact of that exaggeration logically indicate that he had been threatened. It supports the undisputed fact that demands were being made. But "[a] demand for money is simply not a threat." *United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986).

It seems likely that the jury returned its verdict of guilty on counts 3 and 4 because, contrary to what Fed.R.Evid. 404(b) permits, it was influenced by the evidence of violence and actual threats against Bunis and Gaunya. That evidence obviously sufficed to sustain the convictions of Zimmitti and Strano on counts 1 and 2 concerning Bunis; and the convictions on those counts, for which Zimmitti and Strano, respectively, were sentenced to concurrent prison terms of eight years and five years, are not challenged on appeal. But the government, having elected to prosecute defendants for offenses with respect to DiPietro in counts separate from those concerning Bunis, was required to present sufficient evidence to prove beyond a reasonable doubt that the defendants engaged in unlawful conduct against each alleged victim. We are unpersuaded that the evidence cited by the government, taken item by item or in any combination of items, was sufficient to meet its burden with respect to the counts concerning DiPietro.

## CONCLUSION

The judgments are reversed with respect to the convictions on counts 3 and 4, and the matter is remanded for the dismissal of those counts against Zimmitti and Strano.