UNITED STATES of America, Plaintiff,

v.

**Morris LEVY, Howard Fisher, and Dominick Canterino, Defendants.**

**Crim. No. 86–301.**

United States District Court,
D. New Jersey.

Aug. 23, 1988.

Samuel A. Alito, Jr., U.S. Atty. by Bruce Repetto, and Donald Davidson, Asst. U.S. Attys., Newark, N.J., for plaintiff U.S.

Martin London, Stuart M. Cobert, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Levy.

Leon Baer Borstein, Borstein & Sheinbaum, New York City, for defendant Fisher.

Michael B. Pollack, New York City, for defendant Canterino.

## OPINION

BROTMAN, District Judge.

### I. *Introduction*

Defendants Levy, Fisher and Canterino have made various post-trial motions following their convictions on two counts of conspiracy to extort John LaMonte. The defendants contend the following relief is appropriate:

(A) a judgment of acquittal, pursuant to Fed.R.Crim.P. 29, based on the insufficiency of the evidence, or a new trial, pursuant to Fed.R.Crim.P. 33, on the ground that the convictions are against the weight of the evidence;

(B) a new trial, on the ground that the jury was "improperly influenced and inflamed by the prosecution's implicit and explicit references to organized crime";

(C) dismissal of the indictment, based on Assistant United States Attorney Repetto's "promise" that he would terminate the prosecution if the defendants' allegations that the Federal Bureau of Investigation ("F.B.I.") assisted John LaMonte in illegal bootlegging activity and witness intimidation were proved;

(D) a new trial because of the circumstances of the government's belated decision not to call LaMonte as a witness;

(E) dismissal or a new trial based on the government's "concession" that LaMonte is an untruthful witness, since the surveillance evidence used at trial was obtained through the use of wiretap applications containing representations made by LaMonte, and since LaMonte may have testified before the grand jury; or

(F) a hearing to determine whether surveillance evidence used at trial should have been suppressed based on an F.B.I. Agent's failure to disclose certain prior wiretap information in wiretap applications.

For the reasons set forth below, the court finds that the convictions of Domin-

ick Canterino and Morris Levy should stand, and, accordingly, denies the post-trial motions of these defendants. The court, however, after carefully reviewing the trial transcripts, as well as the transcripts of the tape recorded conversations which were introduced at trial, finds that the evidence presented by the government is insufficient as a matter of law to support the conviction of Howard Fisher. Therefore, defendant Fisher's motion for a judgment of acquittal will be granted.

## II. *Factual Background*

The transaction which gave rise to the indictment underlying the prosecution of defendants Levy, Fisher and Canterino involved a sale of "cut-out" records [1] by Music Corporation of America ("MCA") to Consultants for World Records ("World"). World, in turn, sold the majority of these records to Out of the Past, a record wholesale company owned by John LaMonte. As part of this deal, Roulette Records ("Roulette") agreed to act as guarantor for payment to MCA. Morris Levy is, and was at the time of this transaction, the President of Roulette, and Howard Fisher is and was the comptroller. The arrangement was such that whatever portion of the sales price that was not paid to MCA by LaMonte or World would have to be paid by Roulette.

The government alleged at trial that defendants Levy, Fisher and Canterino conspired together with several other unindicted co-conspirators, including Gaetano Vastola and Elias Saka, to use extortionate means against John LaMonte to force him to satisfy the MCA debt by either making cash payments or by returning merchandise. In support of this charge, the government introduced numerous surreptitiously recorded conversations among the alleged co-conspirators, during which the topic of discussion was how and when LaMonte was going to make payment. Defendants do not dispute that such conversations took place, but do argue that at no time during these talks was an agreement reached to use force or threats of force against LaMonte to make him pay the MCA debt.

Accordingly, defendants moved for judgments of acquittal, pursuant to Rule 29, at the close of the Government's case. These motions were denied. Defendants then reviewed their motions after the close of the defendants' case. The court reserved on these motions, which were subsequently incorporated into defendants' present applications for post-conviction relief.

## III. *Discussion*

### (A) *Rule 29 motion*

Rule 29 of the Federal Rules of Criminal Procedure provides in pertinent part:

(c) Motion After Discharge of Jury. If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It should not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

Fed.R.Crim.P. 29(c).

On a motion for judgment of acquittal the court must view the evidence in the light most favorable to the Government. *United States v. Pratt*, 429 F.2d 690 (3d Cir.1970). If there is sufficient evidence in the record upon which a rational jury could find beyond a reasonable doubt that the Government has proved all the elements of the offenses charged, a motion for judgment of acquittal may not be granted. *Id.; United States v. Doan*, 710 F.2d 124, 126–27 (3d Cir.1983).

---

**1.** Daniel McGill, a vice-president of MCA, testified at trial that cut-out records are "records that are no longer available for sale in the normal course of business and have been deleted from the catalogue and normally are sold as surplus at a reduced price." Trial Transcript (hereinafter abbreviated at "TT.") of May 12, 1988 at 480.

*United States v. Mastro*, 570 F.Supp. 1388, 1390 (E.D.Pa.1983).

■ Defendants were charged with and convicted of engaging in a conspiracy to use extortionate means to collect an extension of credit, in violation of 18 U.S.C. §§ 894 and 1951. Under both of these sections, the term "extortionate means" encompasses the use of express or implicit threat of use of physical force.

In order to prove a conspiracy, the government has to establish "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit the underlying offense." *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.), *cert. denied*, 475 U.S. 1024, 106 S.Ct. 1220, 89 L.Ed.2d 330 (1986). Moreover, "[o]ne of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." *United States v. Wexler*, 838 F.2d 88, 91 (3d Cir.1988), *citing United States v. Kates*, 508 F.2d 308, 310–11 (3d Cir.1975).

### 1. Levy and Canterino

■ In denying the earlier Rule 29 motions of Levy and Canterino, this court noted that Government Exhibit 138 ("G–138"), a tape recording of a September 23, 1985 meeting in Morris Levy's office at Roulette, could, in the context of the other evidence presented, support judgments of conviction against Levy and Canterino. Participating in this meeting at various times and to varying degrees were Morris Levy, Gaetano Vastola, Howard Fisher, Elias Saka and Dominick Canterino.[2]

There is no doubt that the topic of conversation during this meeting was collection of the debt owed by LaMonte, either in the form of money payment or return of merchandise. What was disputed at trial, however, is whether there was any agreement among defendants and the unindicted co-conspirators to use extortionate means to collect that debt.

As the court stated in its prior opinion on the Rule 29 motions of Levy and Canterino, a reasonable jury could infer, based on the recorded evidence embodied in G–138, that during the September 23, 1985 meeting, an agreement was reached to use extortionate means to force LaMonte to either ship goods back to MCA or pay his debt. G–138A at 948.[3] At several points during the G–138 conversation, the suggestion was made that LaMonte was going to be made to "ship or pay."

For example, at page 62 of G–138A, Levy says to Vastola:

> What do you do, you're asking me the same question you asked me a year ago. You make him pay. You go take the goods, you go do what you gotta do and you make him pay. He's got to pay.

Vastola replies:

> Oh yeah, he's got to pay.

Later in the conversation, after Canterino has arrived, Saka states:

> You know something. I was sure until he told me that Charlie's in in trouble but ah, ah, but if, ah if Charlies' gonna get out of his trouble he needs goods like this. And if I don't sell them to Charlie I'll find, we'll find somebody but the thing is not to leave the stuff in his hands. Because with him it will disappear. See we're talking about going in and physically taking the goods out of his place.

*Id.* at 122. Then, at page 134 Vastola states:

> Alright, we're resolving it this way if it's alright with everybody. We're going

---

**2.** It is evident from G–138 that Levy, Saka and Vastola were present for the entire conversation, while Canterino's arrival at Morris Levy's office is indicated at page 115 of the government's transcript of G–138, which is 172 pages long. Also, Howard Fisher's participation in certain distinct portions of the September 23, 1985 conversation is evidenced by statements which are made both by him and directly to him. However, it is unclear, from listening to G–138, whether Fisher remained in Levy's office during those periods when he is neither speaking nor being spoken to.

**3.** Citations to G–___A refer to the government's transcripts of the tape recorded conversations which the government introduced into evidence at the trial.

over there Friday morning, we're gonna make him ship back all the stuff....

Finally, Vastola is heard to say:

Well, Mersh [referring to Levy], here's what I'm saying. I'm not responsible for John LaMonte or anything pertaining to this deal. So what I'm trying to bring out to you is I want this thing resolved more than you because I know what it means. I know what the problem you're having right now with MCA and I want it resolved and we're gonna resolve it. One way or the other John LaMonte will pay this money. I don't care how he's gonna pay it.

Id. at 154. It is also worth noting that at no time during the meeting is there discussion of invoking any legal process or means to obtain repayment from LaMonte.

Additionally, G–138 indicates that Levy, Canterino Vastola and Saka have reached an agreement as to how to resolve the LaMonte problem. *See, e.g. id.* at 152:

Canternio: Is this going to get resolved now?

Levy: If they shipped the goods back, the important part of it's resolved. You know I mean, the other part of it I don't know as far as you and me I am I'm gonna live the same, we're all gonna live the same, fuck it whether that happens or not. (UI) I ain't got nothing to (UI) You know what I'm saying then?

Vastola: Yeah

Levy: But if this gets resolved here, that's the most important part to me anyway.

*See also id.* at 164–65:

VASTOLA: I don't care if he did everything right or he did everything wrong. Here's what I'm saying. I just want to end this thing where nobody's hurt from it that's all. I don't care if I make six cents and I'm sure he don't care, you don't care, nobody cares.

Get you off the hook with MCA for the two forty, then we'll discuss the other things. Am I saying it right ah, ah Dom?

CANTERINO: One thing at a time.

VASTOLA: Right. We take one thing at a time.

CANTERINO: One thing at a time.

VASTOLA: Let's get you done first.

LEVY: Alright, then you gonna see that they ship today?

VASTOLA: Today. Yeah.

SAKA: Stay on him.

Counsel for Levy and Canterino argued vigorously, both in support of their Rule 29 motions and in their summations, that what was said during the September 23, 1985 conversation, when viewed in the light of the government's other tape evidence, may demonstrate an agreement to put pressure on LaMonte, but does not establish a conspiracy to use extortionate means against him. Additionally, counsel for Canterino urged that his client was enlisted to attend the September 23 meeting for the purpose of settling a dispute among Levy and Vastola, and was not there as a participant in an extortionate conspiracy.

These interpretations of the government's tape evidence were apparently rejected by the jury, after it heard the recorded statements said to and spoken by defendants Levy and Canterino, as well as the manner and context in which these words were uttered. The jury was entitled to reach this conclusion. As the Second Circuit recently stated, in evaluating the sufficiency of the evidence supporting convictions for extortion under 18 U.S.C. 894, "In reviewing [the] evidence, we must credit every inference that could have been drawn in the government's favor, and we must affirm the convictions if, from the inferences reasonably drawn, the jury might fairly have found the use of ... [extortionate] means beyond a reasonable doubt." *United States v. Zimmitti*, 850 F.2d 869 (2d Cir.1988), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, *reh. den.*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). This court cannot say that the jury in the present case acted irrationally in concluding that implicit in those statements made

during the September 23, 1985 meeting in Morris Levy's office was the contemplated use or threatened use of force.

Defendants actually cite the *Zimmitti* decision as being supportive of their position. In that case, the Second Circuit reversed the convictions of two defendants for using and conspiring to use extortionate means to attempt to collect an extension of credit, in violation of § 894(a)(1). The facts of *Zimmitti*, however, are distinguishable from the case at bar.

In *Zimmitti*, the court examined prosecution evidence of what was said and done by defendants to the alleged extortion victim, and found that, while defendants may have "leaned on" the debtor, there was no evidence in the record of the making of either explicit or implicit threats. The court also noted that several inferences which the government urged the jury to draw were impermissible as a matter of law. These inferences included the suggestion that the jury could have inferred implicit threats from their own in-court observations of the demeanor and character of defendants, *id.* at 874, or that the jury could consider the fact that defendants had actually used force or threats on others in considering whether such tactics were used on the alleged victim.

Nowhere in the *Zimmitti* decision does the court evaluate the acts or communications of the defendants *inter se* to determine whether evidence of an extortionate conspiracy existed. Indeed, it does not appear from a reading of the Second Circuit's opinion that evidence of what was said and done between the defendants, outside the presence of the purported victim, was even introduced. Therefore, the government apparently tried to establish the conspiracy charged in *Zimmitti* by proving the extortion itself. The court, having found the evidence insufficient on the substantive counts, had also to reverse the convictions on the conspiracy counts.

In the present case, the jury had only to determine whether defendants agreed to commit extortion. The evidence needed to prove this conspiracy is qualitatively different from that which would be required to prove that defendants actually used or threatened to use force against LaMonte. "[I]t is an axiomatic principle of law that a conspiracy charge may be sustained on circumstantial evidence alone." *United States v. Migliorino*, 238 F.2d 7, 9 (3d Cir.1956). Indeed, criminal conspiracies are seldom susceptible of direct proof, and, consequently, a formal or express agreement need not be demonstrated to prove the existence of a conspiracy. *United States v. Frank*, 290 F.2d 195, 196 (3d Cir.1961); *United States v. Andrus*, 775 F.2d 825, 853 (7th Cir.1985) ("because an agreement is difficult to prove with direct evidence, circumstantial evidence and reasonable inferences drawn therefrom ... may serve as proof.") This point was aptly explained by the Second Circuit in *United States v. Cassino*, 467 F.2d 610 (2d Cir. 1972), *cert. denied*, 410 U.S. 913, 93 S.Ct. 957, 34 L.Ed.2d 276 (1973):

> To establish a conspiracy the government is not required to show that two or more persons sat around a table and then entered into a solemn pact orally or in writing stating that they have formed a conspiracy to violate the law and setting forth details of the plan like an architect's blueprint. It would be extraordinary if ever such a situation existed.

Id. at 618–19.

Accordingly, in finding the existence of a conspiracy among Levy, Canterino and some or all of the unindicted coconspirators, the jury did not have to find that the words and acts of these men, if communicated to LaMonte, would have been extortionate. Rather, the jury only had to conclude that this conduct evinced an agreement to use or threaten the use of force. The jury having so concluded, this court will not disturb its verdict as it pertains to defendants Levy and Canterino.

### 2. Fisher

■ Howard Fisher presents a different case. Unlike the tape evidence introduced against Levy and Canterino, the government produced no statements either said by or spoken to Fisher from which the jury could have reasonably inferred that he was a knowing and willing participant in a

scheme to extort John LaMonte. Therefore, in order to convict Fisher, the jury had to conclude that the plan to use force or intimidation against LaMonte was communicated to Fisher through words or conduct which were not in evidence. Such an inference does not constitute sufficient evidence to sustain an extortion conviction.

The foregoing is illustrated by the government's argument in opposition to Fisher's Rule 29 motion, wherein the government emphasizes several facts which were purportedly established at trial. Initially, the government notes that Fisher was Levy's longtime accountant and comptroller, and that he "was the only person who knew how much had been collected from LaMonte." Government's Brief in Opposition at 9. These facts, however, while demonstrating Fisher's familiarity with the MCA transaction and his close relationship with Levy, do not prove Fisher's knowledge of the extortion scheme, or his intent to participate in that scheme. The Third Circuit "has been obliged to overturn conspiracy convictions because the defendant was not proven to have had knowledge of the illegal objective contemplated by the conspiracy." *Wexler*, 838 F.2d at 91, *United States v. Coleman*, 811 F.2d 804, 808 (3d Cir.1987); *United States v. Samuels*, 741 F.2d 570, 573–74 (3d Cir. 1984); *United States v. Molt*, 615 F.2d 141, 146 (3d Cir.1980); *United States v. Cooper*, 567 F.2d 252, 254–55 (3d Cir.1977). These reversals were required because "[t]he inferences rising from 'keeping bad company' are not enough to convict a defendant for conspiracy." *Wexler*, 838 F.2d at 91. Therefore, Fisher's close involvement with Levy and the MCA transaction does not, in and of itself, constitute sufficient evidence of his knowledge of the agreement to extort LaMonte.

Apart from Fisher's association with Levy and the MCA deal, the government cites its transcribed versions of four exhibits, which it claims support its contention that Fisher's knowledge of the conspiracy

was established at trial. These transcripts are G–102A, G–134A, G–139A and G–142A.

G–142A contains a conversation between Fisher and Elias Saka. In this conversation, the two men discuss having John LaMonte endorse some notes and issue a letter to Roulette, giving Roulette authorization to bill and collect money from some of LaMonte's customers. Fisher also states that he thought Vastola was supposed to go talk to LaMonte about the debt. Saka then explains to Fisher that Vastola had intended to go see LaMonte that same day, but that the meeting had been postponed.

G–134A is a transcription of a conversation between Fisher and LaMonte. During this discussion, Fisher instructs LaMonte on how a return of merchandise to MCA should be carried out.

G–139A consists of a conversation between Fisher and Vastola, during which Vastola asks Fisher if LaMonte has made a return of merchandise to MCA. Fisher tells Vastola that he does not know whether the return has occurred, after which Vastola expresses frustration at not being able to contact LaMonte:

> Vastola: Ah, he's not around in the plant or any place. Nobody's home in his house. I had people knockin' on his windows. They could' a got arrested, you follow me?
>
> Fisher: Yeah.

Vastola then asks Fisher to check with MCA to determine whether they received the records which LaMonte was supposed to have returned.

Finally, G–142A contains a recorded conversation among Morris Levy, Howard Fisher, a man named Henry Stone and another unidentified male. In the beginning of the G–142 recording, the four men discuss a telephone conversation Levy has just had with a Los Angeles Times reporter, during which the reporter informed Levy that the Times was about to print a story stating that Levy and Vastola were targets of an F.B.I. investigation arising out of their dealings with LaMonte.[4] Levy

---

4. The substance of Levy's conversation with the Los Angeles Times reporter is contained in G–141.

then leaves the room, after which Fisher explains to Stone and the unidentified male that Levy had not intended to take the reporter's call initially, but that Fisher had convinced him to do so:

> FISHER: The guy from the times, he wasn't gonna take the call, and they said well maybe you, don't say anything, maybe you'll learn something from the guy. So he looked at me and he was just about to tell her to hang up and he said "Oh fuck it" picked up the phone. So he says you know if it reads like an interview, he says to me, they lie. So I says yeah, but don't say anything, listen, maybe he'll tell you something. So he picks up the phone and says listen the guy starts to tell you say listen I want you to know that this is being recorded cause he figures if he's gonna be quoted at least the guy should quote him correctly. And then there's a silence for like ten minutes the guy's probably reading him what he's gonna say in the paper.

Then, the three men discuss an incident in Florida where Levy apparently had some sort of verbal altercation with LaMonte in a hotel room. The men express concern that LaMonte may have been wearing a recording device at the time, and that the recorded confrontation may be used against Levy.

Relying on the transcripts of these four exhibits, the government argues that the following facts were established at trial:

(1) that Fisher "acted as Levy's surrogate in dealing with MCA, Vastola, Saka and LaMonte, and in collecting from LaMonte's customers," Government's Brief in Opposition at pp. 9–10, *citing* G–102A, G–134A and G–139A;

(2) that Fisher "gave instructions to Saka and told him what had to be done regarding LaMonte's customers," *id.* at p. 10, *citing* G–102A;

(3) that Fisher "knew when Vastola was to visit LaMonte to put pressure on him and was irked when Vastola failed to go," *Id.,* citing G–102A;

(4) that Fisher "gave instructions to LaMonte regarding what to send to MCA," *id., citing* G–134A;

(5) that Fisher "discussed LaMonte's failure to send goods back with Vastola" and that Fisher "knew that Vastola was sending people to LaMonte's house and place of business," *id., citing* G–139A and G–134A;

(6) that Fisher "was very familiar with LaMonte's business and knew which of his employees could be believed," *id., citing* G–139A;

(7) that Fisher "knew that Levy threatened LaMonte," *id., citing* G–142A; and

(8) that Fisher "was intimate enough with the situation to give Levy advice on how to respond to press inquiries about the extortion attempt," *id., citing* G–142A. These facts, even if accepted as true, do not establish Howard Fisher's knowing and willful participation in the extortion conspiracy.

Points 1, 2 and 4, as numbered above, merely demonstrate that Fisher took steps, in his capacity as comptroller of Roulette, to see that the LaMonte debt was paid. At no time in Fisher's recorded conversations with Vastola, Saka or LaMonte, did Fisher suggest the use of force or threats to collect the debt, nor was that suggestion ever made to him.

Points 3 and 5 indicate that Fisher knew that Vastola was attempting to meet with LaMonte in order to put pressure on him to pay. Again, nothing in the government's evidence demonstrates that Fisher was aware of an intention, on Vastola's part, to use extortionate means on LaMonte.

Point 6, which relates to Fisher's familiarity with LaMonte's business, is simply irrelevant to the issue of Fisher's knowledge of and participation in the extortion conspiracy.

Point 7 relates to Fisher's awareness of an incident in Florida during which Levy purportedly threatened LaMonte. Nothing in the government's case, however, established that Levy's threat was made in conjunction with the MCA transaction. Furthermore, there is no evidence that Fisher

knew about this alleged threat prior to its making, or that he conspired with Levy to bring about the making of the threat.[5]

Lastly, point 8 has absolutely no bearing on Fisher's knowledge of the extortion plot. Fisher's "advice" to Levy regarding the call from the Los Angeles Times Reporter, as it appears in G–142A, contains no statements which implicitly or explicitly reflect an understanding of the existence of the conspiracy.

One exhibit not relied on by the government in its opposition to defendant Fisher's Rule 29 motion is G–138, the recording of the September 23, 1985 meeting in Morris Levy's office. As noted earlier, *See supra* note 2, it is impossible to tell, from listening to G–138, during what portions of that conversation Howard Fisher was present, other than those in which he is speaking or being spoken to. Most importantly, G–138 does not establish Fisher's presence in Levy's office at those times when the statements were being made which this court has found support the convictions of Levy and Canterino. *See* Section III(A)1 of this opinion. Consequently, those statements, and the reasonable inferences which may be drawn therefrom, cannot be considered as evidence of Fisher's guilt.[6]

In sum, none of the evidence relied on by the government to sustain Fisher's conviction establishes his knowledge of the purpose of the conspiracy—to use extortionate means against John LaMonte. Proof of this knowledge is an essential element of the crime charged, which the government had the burden of establishing beyond a reasonable doubt. *Wexler*, 838 F.2d at 91. Moreover, even if the government had established the knowledge element, there was still no evidence introduced at trial that proved Fisher's intent to participate in

the conspiracy. This intent is also an essential element of the crime of conspiracy. *Kapp*, 781 F.2d at 1010; *Kates*, 508 F.2d at 311, 312 (3d Cir.1975) (government must establish that defendant entered conspiracy with specific intent to achieve its illicit purpose; "mere 'knowledge of shadowy dealings' is insufficient to infer that a defendant was a part of the conspiracy."). Therefore, in light of the government's failure to present evidence at trial sufficient, as a matter of law, to convict Howard Fisher of participating in the conspiracy charged in the indictment, this court is constrained to enter a judgment of acquittal on behalf of that defendant.

(B) *Rule 33 Motions for New Trials*

The court, in evaluating a motion for a new trial, must "examine the weight, rather than the sufficiency of the evidence ...," *United States v. Messerlian*, 633 F.Supp. 1493, 1513 (D.N.J.1986), *citing Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), and, in doing so, the court may "assess the credibility of the witnesses." *United States v. Clemons*, 658 F.Supp. 1116, 1119 (W.D.Pa.1987). The court "need not view the evidence in the light most favorable to the verdict," *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980), "but may set aside a verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice." *Mastro*, 570 F.Supp. at 1390, *citing United States v. Phifer*, 400 F.Supp. 719, 723 (E.D.Pa.1975), *aff'd* 532 F.2d 748 (3d Cir.1976).

In conducting the foregoing analysis, some courts have suggested that the court should sit as a "thirteenth juror." *See e.g. United States v. Turner*, 490 F.Supp. 583, 593 (E.D.Mich.1979), *cert. de-*

---

**5.** The court notes that defendants dispute whether G–142 establishes that Fisher had knowledge of the Florida incident, prior to its being discussed in the G–142 conversation. However, since the court, in considering a Rule 29 motion, must view the evidence in the light most favorable to the government, *United States v. Pratt*, 429 F.2d 690 (3d Cir.1970), we will accept as accurate, for the purposes of this motion, the government's interpretation of G–142.

**6.** It is particularly noteworthy that the government failed to establish Fisher's presence at crucial moments of the September 23, 1985 meeting, despite the fact that the F.B.I. had a hidden videotape camera installed in Levy's office at the time of the meeting. *See* TT. of 5/16/88 at 632, where F.B.I. Agent Steinhauser testifies that a video surveillance was installed at the offices of Roulette. No videotape evidence of the September 23 meeting was introduced at trial.

*nied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed. 2d 336 (1981). We reject this approach, however, as suggesting that the court is free to substitute its own judgment for that of the jury. On the contrary, this court does not believe that its discretion "extend[s] to the grant of a motion if the evidence were to fail to convince us of guilt beyond a reasonable doubt—as it would if we were to sit as a juror. Rather, we are empowered to grant a new trial only if we are convinced that the evidence is such that the verdict was not 'rational', *Powell* [469 U.S. 57], 105 S.Ct. [471] at 477 [83 L.Ed.2d 461 (1984)], or if the verdict is against the weight of the evidence." *Messerlian,* 633 F.Supp. at 1514.

While the standards to be applied to a Rule 29 motion and a Rule 33 motion are different, the factors which the court must consider in ruling on both these applications in the present case are more or less the same. That is to say, if defendants had presented to the jury a defense theory which substantially undercut the government's case, or if the credibility of government witnesses were a central issue pertaining to guilt, the court, in evaluating motions for new trials, would have to counterbalance · these elements against the government's surveillance evidence—evidence which the court has determined to be legally sufficient to sustain the convictions of Levy and Canterino. However, neither of these countervailing factors were present in the trial of these defendants.

The government's case was a tape case, which relied primarily, if not entirely, on the recorded conversations which the prosecution introduced at trial. While several witnesses took the stand, the credibility of these witnesses was never seriously drawn into question, nor was their credibility particularly relevant to the central evidence of guilt—the recorded words of defendants and those of their co-conspirators.

Similarly, the case put on by defendant Levy, which suggested that LaMonte, Vastola, Saka and Brocco were coconspirators separate and apart from defendants, with motives and purposes different from and in conflict with those of defendants, did not present evidence which preponderated heavily against a determination of guilt. Indeed, the presence of this alleged separate conspiratorial group is not necessarily inconsistent with the existence of the conspiracy charged in the indictment.

Accordingly, while the court may believe that the jury could have reached a different result, the verdict as rendered against defendants Levy and Canterino does not constitute a miscarriage of justice.

### (C) *Organized Crime References*

Defendants contend that repeated references to organized crime made by the government so inflamed the jury as to require the granting of a new trial. A new trial may be granted, pursuant to Fed.R. Crim.P. 33, "if there is a reasonable probability that trial error could have had a substantial influence and on the jury's decision." *Mastro,* 570 F.Supp. at 1388, *citing Government of the Virgin Islands v. Bedford,* 671 F.2d 758, 762 (3d Cir.1982).

The court finds these contentions to be without merit. Defendants are entitled to a fair trial, not a perfect one. *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), *citing United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983), *cert. denied* 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985); *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). Throughout the course of defendants' trial, this court made diligent efforts to exclude from the jury's hearing explicit and implicit references to organized crime which the court felt were irrelevant to the jury's determination and potentially prejudicial to defendants' due process rights. Despite defendants' previous and current protestations to the contrary, it is felt that the record reflects that the court succeeded in that endeavor. Moreover, to the extent that the aforementioned references constitute trial error, their effect, taken by themselves or cumulatively, cannot be said to have so tainted the jury's deliberations as to deprive defendants of a fair trial. Therefore, the motion of defendants Levy

and Canterino for a new trial on this ground is denied.

### (D) *Repetto's Promise to Dismiss*

■ Defendants argue that the government should be bound by Mr. Repetto's representation during a March 22, 1988 *in camera* proceeding that he would seek to have the present indictment dismissed if government misconduct of the kind defendants then alleged, i.e., witness intimidation or assisting LaMonte in illegal bootlegging activities, were proved. In support of this application, defendants draw an analogy to several cases which stand for the proposition, enunciated in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), that if an executed plea "rests in any significant degree on a promise or agreement of the prosecution, so that it can be said to be part of the inducement or consideration such promise must be fulfilled." *Id.* at 262, 92 S.Ct. at 499.

This analogy is not compelling. Apart from the fact that the linchpin of defendants' analysis is absent in the present case, that being the clear establishment of governmental misconduct, defendants' so-called "detrimental reliance" on Mr. Repetto's representation in no way parallels that of a criminal defendant who enters a guilty plea pursuant to an agreement with the government. While defendants argue that they were induced by the representation to divulge "powerful exculpatory impeachment" evidence, this assertion is invalid on its face, in light of the fact that the witness against whom such impeachment information would have been used, John LaMonte, never took the stand. Therefore, even assuming defendants were compelled to act by the Repetto "promise", their actions did not deprive them of effective cross-examination. In fact, defendants' pretrial disclosures made during the March 22, 1988 proceeding, along with other factors, may well have convinced the government not to call John LaMonte, thereby completely eradicating the incriminating testimony which defendants would have sought to impeach. Accordingly, this motion for dismissal of the indictment is denied.

### (E) *The Government's Belated Decision Not to Call LaMonte*

■ Defendants' application for a new trial based on the government's decision not to call LaMonte is similarly without merit. In fact, defendants cite no cases which would support such a result.

As suggested earlier, defendants made it patently clear before the trial that they intended to make LaMonte's credibility a central issue. This was done not only during the March 22, 1988 proceeding, but also in defendant Levy's motion for pretrial enforcement of Rule 17(c) subpoenas *duces tecum*. These subpoenas were served upon LaMonte and demanded production of certain recording industry documents which Levy contended would show LaMonte's participation in ongoing bootlegging activity. The court granted the defense motion for pretrial production of these documents. The government's decision not to call LaMonte may well have been partially in response to this pronounced defense intention to vigorously attack LaMonte. It is therefore difficult to see how defendants were significantly prejudiced when they, in essence, got what they wanted, in as much as they did not merely undermine the reliability of LaMonte's testimony, but rather removed it completely from the trial.

This application for a new trial is denied.

### (F) *The Government's "Concession" that Lamonte Would Be An Untruthful Witness*

■ The government, in response to defense assertions during summations that the jury should draw an adverse inference against the government because LaMonte was not called to testify, stated in its rebuttal:

> "And as I'm sitting here and Mr. London is raising his voice and lowering his voice and I'm called superman, I'm thinking what is he really saying, what is the drama? What is this about?
>
> And he finished up with John LaMonte. And what he asked you to do was to go into the witness room and decide on John LaMonte. And then you would be right back in here. Because

you would have made a determination. The determination would have been John LaMonte, guilty, innocent, not guilty.

This case is not about John LaMonte. John LaMonte was not a witness. You were instructed the day that I opened that John LaMonte would not be a witness. And the reason I gave you for his not being a witness was that he was not a witness to the state of mind of these three defendants or the state of mind of the co-conspirators.

Would he have provided testimony that would have been interesting? Yes, I said that, also. But I submit to you that the Government has an obligation to this jury to present what it believes to be the truth. And I think that the Government has fulfilled that obligation to you.

We know, from listening to the tapes, what the defendants think of John La-Monte. I think we have a pretty good idea of what John LaMonte thinks of the defendants.

We know that the defendants think that John LaMonte is a liar. We know that they think he's a deadbeat. We know that they think he's a bootlegger. We know that they think he is protected by other individuals, such as Brocco, who doesn't collect the whack-up for the boot-legging. We know all that. We know that from the tapes.

So what is the drama? What is the raising and the lowering of the voice of a very skilled attorney? It's petulance. It's the petulance of a child who cannot try John LaMonte.

If John LaMonte were on the witness stand, he could be tried by the defendants, that's what they wanted to do. That's what the trial they wanted to have was.

But John LaMonte is not here. He's not here because the Government chose not to call him, not to bolster its case.

And you heard that the Government dismissed a substantive extortion charge. The Government chose not to bolster its case with this man's testimony. Because the Government has the obligation to present to you the truth and it has to vouch for its witnesses.

The Government is not going to vouch for John LaMonte. The Government is not here because of John LaMonte. It is here because of what those defendants did. And the evidence shows, unmistakably, that what they did was to conspire to extort from John LaMonte.

John LaMonte's state of mind is not in the case. Their state of mind is in the case. The Government isn't relying on the fact that LaMonte ended up in the hospital for whatever reason. The Government is not relying on the threatening thing in a hotel room in Florida. The Government isn't relying on that at all. That is only one part of what the Government has offered here.

The Government has offered over a long period of time the statements of these particular defendants and others who are trying to control a business and to get their payment out of it, to take from that business. That's what's been presented here."

TT. 5/24/88 at 1347–1350.

Defendants now contend that the foregoing constitutes an admission by the government that all statements made by LaMonte related to this prosecution are false. Defendants point specifically to Mr. Repetto's statement that the government would not "vouch for John LaMonte." Accordingly, defendants seek (1) a hearing, pursuant to the Supreme Court's holding in *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978),[7] to determine whether false statements by LaMonte were knowingly or recklessly included in any of the wiretap appli-

---

7. In *Franks,* the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at defendant's request," at which defendant will have the opportunity to prove the allegation of perjury or reckless disregard by a preponderance of the evidence. 438 U.S. at 155–56, 98 S.Ct. at 2676–77.

cations used to obtain evidence introduced at trial; or (2) dismissal of the indictment based on the government's presentation of false statements to the grand jury through the testimony of LaMonte.

Defendants focus on a small portion of Mr. Repetto's rebuttal argument as to why John LaMonte was not called as a witness and lift it from its context. This is done in an effort to attribute to the government an admission that it knowingly used false statements by John LaMonte to obtain the evidence and indictment underlying this prosecution. However, the thrust of Mr. Repetto's comments was quite different. In seeking to rebut the defense argument that the absence of LaMonte at trial, given his status as a cooperating witness, indicated that the substance of his testimony would have been unfavorable to the government, Mr. Repetto stated that the prosecution chose not to call LaMonte so as to avoid making his credibility, rather than defendants' culpability, the central issue in the case. And while the language about "vouching" was perhaps ill-chosen, the court does not interpret it to be tantamount to a government concession that all information provided by LaMonte was *per se* unreliable, and that the government was aware of this all along.

This motion is denied.

### (G) *F.B.I. Agent Ferreira's Affidavits*

■ Defendants, once again, have moved to suppress evidence of conversations intercepted pursuant to New York Federal Court Orders dated August 26, 1985 and September 20, 1985 (the "New York Orders"). Once again, the basis for these motions is Agent Ferreira's failure to disclose, in the affidavits used to obtain the New York Orders, that (1) a prior surveillance at Video Warehouse had been terminated after ten days once it was discovered that the wiretap application underlying that surveillance was defective; and (2) that prior state electronic surveillance orders (the "Union County Orders") had involved

some of the same individuals who were intended as targets of the proposed New York surveillance.

This court addressed both of these alleged defects in the Ferreira Affidavits in an earlier opinion made part of the record of defendants' trial on May 16, 1988.[8] In that opinion, the court denied defendants' motion, finding that Ferreira's failure to mention the termination of the Video Warehouse surveillance and the prior Union County Orders did not constitute "proof of deliberate non-compliance in an effort to mislead the court." TT. of 5/16/88 at 616. The present motion is largely a rehash of these earlier suppression motions which were denied, and, in this regard, the court will decline the invitation to reconsider its prior ruling.

Defendants do, however, contend that "new evidence," namely testimony by Detective–Sergeant Robert Jones, was adduced at trial, which now requires a hearing to determine whether Ferreira did indeed have actual knowledge of the prior Union County Orders which he failed to include in his affidavits. Jones testified that, to the best of his knowledge, a Union County official, Investigator Wlazlo, input information regarding the Union County Orders into a computer at the F.B.I. office in Red Bank, New Jersey, on dates prior to Ferreira's submission of the applications for the New York Orders. Defendants urge that this information must have found its way into the F.B.I. computer files, known as ELSURS, which every F.B.I. agent is required to review prior to applying for a wiretap or extension order. The purpose of this review is to determine whether any prior or existing surveillance orders concern the targets of the proposed surveillance, so that, if so, such information can be included in the wiretap application. Ferreira has already submitted an affidavit, in opposition to defendants' prior suppression motion, stating that he

---

**8.** In fact, this is actually the third time that this court has been asked to suppress the fruits of the New York Orders, based on Ferreira's failure to disclose the Union County Orders. *See United States v. Vastola,* 670 F.Supp. 1244, 1283

(D.N.J.1987) (court determined that Ferreira's omission of prior Union County Orders in his applications for the New York Orders was unintentional, thereby making suppression unnecessary).

checked these F.B.I. files before applying for the New York Orders, and found no information concerning the Union County Orders.

This court remains unconvinced, even in light of the proffered "new evidence," that Agent Ferreira knowingly withheld information regarding the Union County Orders from the courts which issued the New York Orders. Jones' testimony, while stating that Investigator Wlazlo used a computer at the F.B.I. Red Bank office to keep a record of the Union County Orders, does not demonstrate that information about those orders were entered in the F.B.I. files. Furthermore, Jones has submitted an affidavit in opposition to defendants' present motion which clearly explains that Wlazlo did not input data concerning the Union County Orders into the ELSUR files. At ¶ 3 of his affidavit dated June 21, 1988, Jones states:

> 3. In connection with the above-mentioned electronic surveillance in 1984–1985 by the Union County Prosecutor's Office, I know that Investigator Wlazlo used a small personal computer in the Resident Agent's office of the Federal Bureau of Investigation (the "FBI") in Red Bank, New Jersey, to collate, present, and maintain Union County wiretap information. To the best of my knowledge, the Union County wiretap input and output from the small personal computer used by Investigator Wlalzo was never put into the Federal FBI electronic surveillance system called "ELSUR", the terminal for which, I believe, is located in the FBI's Newark office.

In light of the foregoing, defendants' motion for a hearing on the issue of Agent Ferreira's state of mind regarding the nondisclosed information is denied.

An appropriate order will be entered.

## ORDER

This matter having been brought before the court on motions of defendants Morris Levy, Howard Fisher and Dominick Canterino for: (a) judgments of acquittal, pursuant to Fed.R.Crim.P. 29(c), on both counts of the redacted indictment; or, in the alternative (b) a new trial; (c) dismissal of the indictment; or (d) hearings to determine whether false statements were knowingly included in affidavits used to obtain court orders approving electronic surveillance which gave rise to evidence introduced at trial; and

The court having considered the submissions and oral argument of the parties; and

For the reasons set forth in the court's opinion filed this date;

IT IS on this 23rd day of August, 1988 HEREBY ORDERED that:

(1) the motion of defendant Fisher for the entry of a judgment of acquittal on both counts of the redacted indictment is GRANTED; and

(2) the motions of defendants Levy and Canterino are DENIED.

No costs.